1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3

IN RE:  ANDROGEL ANTITRUST      )
 4                              )  Docket No. 1:09-MD-2084-TWT
LITIGATION (NO. II)             )
 5                              )  January 7, 2010
                                )  Atlanta, Georgia
 6  _____ )  2:03 p.m.

 7

 8

 9                TRANSCRIPT OF THE MOTIONS HEARING
            BEFORE THE HONORABLE THOMAS W. THRASH, JR.,
10                  U.S. DISTRICT COURT JUDGE

11

APPEARANCES OF COUNSEL:
12

On behalf of the Plaintiffs:       Ken Canfield
13                                 Bruce Gerstein
                                   Markus Meier
14                                 Corey Holzer

15  On behalf of the Defendants:   Mark Ryan
                                   Steven Sunshine
16                                 Teresa Bonder
                                   Mark Gidley
17                                 Eric Grannon

18

19

20        Proceedings recorded by mechanical stenography
             and computer-aided transcript produced by
21
                  SUSAN C. BAKER, RMR, CRR
22                  2194 U.S. COURTHOUSE
                   75 SPRING STREET, S.W.
23                  ATLANTA, GA  30303
                      (404) 215-1558
24

25
```

2

1         (Proceedings held in Atlanta, Georgia, January 7,

2    2010, 2:03 p.m., in open court.)

3         THE COURT:  All right.  This is the case of In Re:

4    AndroGel Antitrust Litigation, 09-MD-2084.

5         Normally I ask counsel for the parties to introduce

6    yourself and the parties you represent, but given the numbers I

7    see out there I think I'll just wait and let you introduce

8    yourselves when and if you say anything.

9         As I said, this is a hearing -- or it is a hearing on

10    the motions to dismiss in these cases.  What I propose to do is

11    to give the Defendants collectively an hour and the Plaintiffs

12    collectively an hour.

13         With that understanding, do the Defendants have any

14    agreement among yourselves as to who's going to speak and for

15    how long?

16         MR. RYAN:  Your Honor, Mark Ryan on behalf of Solvay.

17         Yes, we do.  We're going to divide up the arguments.

18    And when I -- I'm going to go first, and I will explain to the

19    Court at the podium how we are going to do it.  And we are

20    going to save some time for rebuttal as well, so we won't take

21    the whole hour on our initial presentations.

22         THE COURT:  All right.  How about the Plaintiffs,

23    y'all have some understanding of how you are going to divide

24    your time up, Mr. Canfield?

25         MR. CANFIELD:  We do, Your Honor.  I am going to

1   speak very briefly, and then Markus Meier from the FTC will be

2   presenting their position.  And Bruce Gerstein will be

3   presenting the private Plaintiffs' position.

4           THE COURT:  All right.  Unfortunately, I'm going

5   to --

6           MR. HOLZER:  Your Honor, excuse me.  I am Corey

7   Holzer on behalf of the end-payer Plaintiffs.  We would simply

8   ask for five minutes of the Court's time if needed.

9           THE COURT:  Well, I'm going to strictly enforce the

10  hour limit.  With the number of parties, the number of claims,

11  the number of defenses and the number of arguments that are

12  being made, if I don't it'll just go on forever and we'll all

13  be snowbound here for the next couple of days.  So however it

14  works out, if the Plaintiffs' time is up it's going to be up.

15          MR. HOLZER:  I understand.

16          THE COURT:  And it's the same for the Defendants.

17          All right.  The Defendants have the burden on the

18  motions, so I'll hear from you first.

19          MR. RYAN:  Thank you, Your Honor.  Again, it's Mark

20  Ryan on behalf of Solvay Pharmaceuticals.

21          Your Honor, I am going to address the question of why

22  the 11th Circuit decision in Schering-Plough requires a

23  dismissal of the FTC complaint.  Mr. Sunshine will explain why

24  the allegations of sham patent litigation set forth in the

25  direct purchaser complaints are insufficient as a matter of

4

1    law.

2            Now, Your Honor, I'd like to point out that once the

3    sham allegations are dismissed the private Plaintiffs will find

4    themselves in the same boat as the FTC Plaintiffs -- as the FTC

5    is with respect to Schering-Plough.  The FTC, of course, had a

6    lengthy investigation two years with depositions and document

7    productions; and they have not alleged that the underlying

8    patent litigation that occurred before Your Honor was a sham.

9    Only the private Plaintiffs in an effort to plead around

10   Schering-Plough have done that.  Stripped of those allegations,

11   the sham allegations, the private Plaintiffs' complaints are

12   equally and fully subject to dismissal under Schering-Plough.

13           Finally, counsel for Par and Paddock is going to

14   explain why the claims against those Defendants are subject to

15   dismissal on additional grounds.

16           As I pointed out, Your Honor, I am going to try to

17   save time for rebuttal.

18           THE COURT:  All right.

19           MR. RYAN:  Your Honor, this is really a case about

20   the applicability in the rule of Schering-Plough which was

21   announced by the 11th Circuit and then re-announced in the

22   Andrx case before the 11th Circuit.  The standard is the proper

23   analysis quoting from the case of antitrust liability requires

24   an examination of:  One, the scope of the exclusionary

25   potential of the patent; two, the extent to which the

5

1    agreements, that is to say the settlement agreements, Your

2    Honor, exceed that scope; and, three, the resulting

3    anti-competitive effects.

4          So in somewhat plainer language, Your Honor, what is

5    the task before this Court?

6          On the one hand, the Court should look to see what

7    the allegations are about the exclusionary potential or the

8    scope of the patent at issue in this case.  Then on the other

9    hand, the Court examines what the allegations are about the

10   scope of the exclusion, alleged exclusion of competition under

11   the settlement agreements.  And then the question becomes do

12   the settlement agreements in any way expand the exclusionary

13   power or potential of the patent.  If the settlement agreements

14   do not do that, that is to say they do not extend the power of

15   the patent, then the case is at an end and the complaint must

16   be dismissed.

17         Now, Your Honor, the FTC complaint and the private

18   complaints are clear that the patent in this case expired in

19   the year 2020.  It's also clear and undisputed that the

20   settlement agreements allow generic competition to begin in

21   2015.  So with respect to the temporal scope of the patent,

22   there's no dispute that the agreements are within, that is to

23   say they are less than, the right to exclude granted by the

24   patent.

25         With respect to the product at issue here, the FTC

1    complaint and private complaints are clear that the patent

2    concerned the drug AndroGel.  The settlement agreements concern

3    generic AndroGel.  There's no claim in this case, Your Honor,

4    that the settlement agreements -- there's no claim in this case

5    the settlement agreements concern any other drug than the drug

6    that is the subject of the AndroGel patents or AndroGel patent.

7          Your Honor, those facts which appear in the pleadings

8    and this Court's task -- because absent some allegation that

9    the power of the patent has been extended via the settlement

10   agreements, beyond what the patent itself provides the case is

11   in an end.  And that's the rule of Schering-Plough.  That's the

12   rule of Andrx.

13         And, Your Honor, I want to point out that there are a

14   couple of places in the FTC brief that we are in complete

15   agreement with.  On page 2 of their brief, the FTC explains --

16   this is the opposition to the motion to dismiss.  The FTC

17   explains that in the past -- they say to be sure in the past

18   the FTC has interpreted Schering-Plough precisely the way the

19   Defendants in this case interpret Schering-Plough in our moving

20   papers.  And on page 28 of their brief, the FTC acknowledges

21   that two other Federal Circuits, the Federal Circuit and the

22   2nd Circuit, take the same view of the rule of law as

23   Schering-Plough.

24         Now, the FTC doesn't point out but it's clear in

25   those cases that those cases actually relied on the analysis in

1    Schering-Plough.  They looked to what the 11th Circuit had done

2    in arriving at the same result.

3         So, now, where did the FTC make these other

4    statements?

5         One of the places they made these statements was to

6    the Supreme Court of the United States when they sought

7    reversal of the Schering-Plough decision.  And the FTC in that

8    paper describes Schering-Plough as a case that, "effectively

9    immunizes all payments to delay generic competition provided

10   the delay does not extend beyond the nominal scope of an

11   untested patent unless the patent claim is an obvious sham or

12   the patentee knew that his claim was without merit."

13        So that's the way prior to its papers in this case

14   that the FTC described the scope of Schering-Plough.  And they

15   don't make any claim as I said about sham, and they don't

16   allege that Solvay knew that its patent was without merit.  So

17   under their previous view of the case, they would agree with us

18   that the case would be at an end.

19        Now, the other places where the FTC has expressed

20   agreement with our view of Schering-Plough are congressional

21   testimony and in public speeches by commissioners.  And in our

22   briefs, Your Honor, we cite the Court to where those statements

23   can be found.

24        So we have a situation where you have

25   Schering-Plough, you have Andrx, you have the Tamoxifen case in

1    the 2nd Circuit and you have the Cipro case in the Federal

2    Circuit, all of which -- in the FTC's own statements all of

3    which are on the same page.  You also have a District Court

4    decision, a recommendation of a special master that we cite in

5    our papers from the District of New Jersey and a State Court

6    case involving the Cipro product in California.  All of these

7    authorities agree on what the meaning of Schering-Plough is.

8            So what that leaves us with is the FTC position in

9    this case that the Court should seize on -- and there's

10   remarkably little attention paid, I believe, to the Schering

11   decision in the Government's brief here.  But they seize on a

12   sentence fragment in the concluding paragraph of the

13   Schering -- of the 11th Circuit decision and say, Well, the

14   Court is supposed to evaluate the strength of the patent.

15   That's what they ask this Court to do.  And what they're asking

16   the Court to do is to have a trial, a trial on the merits of

17   the AndroGel patent.

18           Your Honor, that position cannot be reconciled with

19   the entire thrust and language and subsequent history, if you

20   will, of the Schering-Plough decision.  And I think as a

21   practical matter and as I'm sure the Court is aware if the law

22   were -- and this is what the 11th Circuit recognized -- if the

23   law were that patent settlements could be attacked because the

24   Federal Trade Commission or private parties wish to bring

25   antitrust claims essentially alleging that the patent holder

1    would have lost or could have gotten a better result or that

2    the Defendants, the generic companies could have gotten a

3    better result in patent litigation and we'd be exposed to

4    government sanction or treble damages, it would make it very

5    difficult, if not impossible, to settle patent cases.

6             And as the Court observed in Schering, and I'll quote

7    from the decision, "The general policy of the law is to favor

8    the settlement of litigation, and the policy extends to the

9    settlement of patent infringement suits.  Patent owners should

10   not be in a worse position by virtue of the patent rights to

11   negotiate and settle surrounding lawsuits."

12            So, Your Honor, at the end of the day we have a very

13   straightforward request of this Court which is simply to apply

14   what we believe is the clear rule of Schering-Plough.  And we

15   recognize that the FTC may disagree with that result, that they

16   do disagree with the result in Schering-Plough.  But in all due

17   respect to the Federal Trade Commission and to the private

18   Plaintiffs, this is not the forum in which to express

19   disagreement with the 11th Circuit.  They have to take that

20   argument elsewhere.  As, of course, as Your Honor is aware,

21   this Court is bound to apply the 11th Circuit law.

22            So, Your Honor, that concludes my opening remarks if

23   the Court doesn't have any questions.

24            THE COURT:  All right, Mr. Ryan.

25            MR. RYAN:  Thank you.  I'll turn it over to

1  Mr. Sunshine.

2          MR. SUNSHINE:  Good afternoon, Your Honor.  Steve

3  Sunshine for --

4          THE COURT:  Good afternoon, Mr. Sunshine --

5          MR. SUNSHINE:  -- Watson Pharmaceuticals.

6          Mr. Ryan just ably explained why the FTC's complaints

7  against the Defendants fail as a matter of law under

8  Schering-Plough.  As he noted, the same argument applies in

9  part to the private Plaintiffs' complaint.  But where the

10 private Plaintiffs have parted company from the FTC is that

11 they have taken a giant step.  They have alleged something that

12 the FTC despite its long investigation has never alleged or, in

13 fact, even hinted at.  And that's namely that the three-year

14 patent litigation that occurred before Your Honor was, in fact,

15 completely baseless and a sham.

16         And, moreover, these baseless litigation claims which

17 if they are true would have been of a Grade A to this case

18 initially for the private Plaintiffs were never included in the

19 California complaint that they first filed.  It was only upon

20 the transfer to this court to Your Honor that those claims were

21 included.

22         We think it's apparent that the private Plaintiffs

23 have added these baseless litigation claims to try to drive

24 this case into this very narrow exception recognized by the

25 11th Circuit in Schering-Plough.  Nevertheless, we believe that

1   these baseless litigation claims should be dismissed as a

2   matter of law at this stage.

3          I understand that, you know, Plaintiffs will have

4   argued in their opposition papers and I expect will argue today

5   that the complaint contains enormous detail.  There are a

6   number of factual allegations.  But I'm going to summarize

7   briefly today --

8          THE COURT:  Let me interrupt you, Mr. Sunshine.

9          Do you interpret the indirect purchasers as asserting

10   a sham litigation claim in their complaints?

11          MR. SUNSHINE:  Your Honor, I believe that there are

12   three indirect purchaser complaints.  Two of them I don't

13   believe include any allegations.  I think one FOP, Fraternal

14   Order of Police, has what I believe is one conclusory

15   allegation of sham litigation.  So whether it's in that --

16   whether it's in FOP or not, because I do think as I'll mention

17   that one conclusory allegation can pretty quickly be ignored

18   for purposes of the motion to dismiss.

19          THE COURT:  All right, Mr. Sunshine.

20          MR. SUNSHINE:  Okay.  Thank you.

21          Your Honor, the point that I was making was

22   despite -- and I'm sure we'll hear this argument from the

23   Plaintiffs today.  We certainly saw it in their opposition

24   papers that there's an enormous amount of factual detail in the

25   complaint.  But for three different reasons that we'll pull

1    together today and explain, this case still should be dismissed

2    at this stage.  And I'll explain them in more detail.

3         But it's really the combination of Twombly and Iqbal

4    which provides the plausibility standard, the Professional Real

5    Estate Developers case which is a Supreme Court case on what

6    this high standard is for baseless litigation, and third and

7    most importantly is this Court's own experience with the patent

8    litigation and the record in the underlying litigation.  When

9    put --

10        THE COURT:  You're right, Mr. Sunshine.  It's the FOP

11   case that says Unimed engaged in sham litigation.  That's all

12   it says.  That's the substance.  I mean, that's the total of

13   what it said.

14        MR. SUNSHINE:  I agree, Your Honor.  And I think you

15   can dispatch that allegation very quickly under Iqbal but even

16   if we were to accept that allegation in the FOP complaint that

17   it fails for the same reasons as we're talking about here with

18   respect to the direct purchaser complaints.

19        In putting these factors together, Twombly, Iqbal,

20   PRE and the underlying patent litigation, as we have suggested

21   to you in the papers there's two separate levels we can look at

22   why these complaints aren't plausible.  First, as the Supreme

23   Court commanded, we can look in context and we can see all the

24   reasons why these baseless litigation claims don't make any

25   sense in this context.  Secondly, we can look at the actual

1    status of the underlying patent litigation and look at it just

2    long enough to understand that there was actually a dispute and

3    a fight there.  And so at both levels I think we can dispose of

4    the case or Your Honor can dispose of the case on either of the

5    levels.  And, of course, taken together we would certainly

6    suggest to Your Honor that dismissal is mandated here.

7            Before jumping into those two arguments about the

8    context of this entire litigation shows it's implausible and

9    the status of the underlying litigation, I'd like to just

10   mention a couple of key points about the legal standard.

11   Twombly and Iqbal have been the law now for a couple of years.

12   I know there's various schools of thought about how much

13   Twombly and Iqbal changed and how much it may have codified

14   existing practice, but I think it's fair to say that after

15   Twombly and Iqbal it's clear that the Supreme Court expects

16   that there be a plausibility standard.

17           In Twombly the Supreme Court ruled that an antitrust

18   cause of action can't be pled in a conclusory fashion but must

19   state a claim for relief that's plausible on its face.  Iqbal

20   as we were just saying, Your Honor, just made it clear that the

21   Court need not accept any legal conclusions in evaluating the

22   motion to dismiss.  And, finally, and what I think is an

23   important point and perhaps just recognizing what trial courts

24   do all the time in Iqbal the Supreme Court said that the

25   determination of plausibility is context specific and the trial

1  court must draw on its experience and common sense in deciding

2  whether these claims are plausible.  In total and in another

3  point, the Supreme Court has said the complaint in its context

4  must nudge the claim for relief from possible to plausible.

5          Turning to --

6          THE COURT:  If somebody could tell me exactly what

7  that means, I would really appreciate it.

8          MR. SUNSHINE:  Well, fortunately, in this case, Your

9  Honor, we are nowhere close to that line.  But I understand

10 that not everybody reads Twombly and Iqbal as being quite as

11 path-breaking as perhaps others do.

12          Turning to PRE, that opinion is an opinion by Justice

13 Thomas of the Supreme Court; and that opinion sets out the

14 standard for when something must -- for what qualifies as

15 baseless litigation.  And Justice Thomas and the Supreme Court

16 in that opinion were very concerned about the chilling effect

17 of allowing antitrust claims to be brought when litigants are

18 seeking access to the Court.  So the Supreme Court purposely

19 set a very high standard.

20          The PRE standard has two elements.  One's objective.

21 One's subjective.  The objective test -- and this is a test

22 akin to Rule 11 -- is that the claim must be objectively

23 meritless.  The Supreme Court in another point says that no

24 reasonable litigant could realistically expect any chance of

25 success, again, akin to a Rule 11 standard, very high, very

1    difficult standard.

2         When you take, I think, the PRE standard together

3    with the Twombly standard, what it says is for a baseless

4    litigation claim to survive in the underlying litigation,

5    underlying patent litigation in this case there needs to be no

6    determinative legal issues and no genuine disputes of fact.

7    And what we'll argue to Your Honor as we go through some of

8    this patent litigation, there's one thing that the history of

9    the patent litigation shows is that it was highly disputed and

10   highly contested.

11        And, in fact, there's in the opposition papers of

12   Plaintiffs I think that they make the claim that since there

13   were factual disputes from the Plaintiff and this is a motion

14   to dismiss in the antitrust case, therefore, you can't grant a

15   motion to dismiss when there's factual disputes.  But I think

16   that misses the point, and I would suggest that in that case

17   they're just wrong.  Because we're talking about the underlying

18   patent litigation and whether or not that was baseless, to the

19   extent there were factual disputes in the underlying patent

20   litigation if you then apply the PRE standard to the underlying

21   patent litigation as a matter of law the case can't be baseless

22   if indeed those factual disputes existed.

23        Okay.  With that said about the legal standard, let

24   me turn to the two arguments, one, the context sets of

25   arguments and, two, the status of the underlying patent case.

1    In the context arguments, I won't dwell on these.  We go

2    through many or we go through all of them in the papers.

3           But how do we know from the facts of this entire case

4    and proceeding that these claims are baseless?

5           First, as this Court is more than aware having

6    supervised the underlying patent litigation for over three

7    years, it was hard fought.  It was complicated.  It was

8    protracted.  It was contested.  There were hundreds of

9    thousands of documents exchanged, 15 experts on all sides of

10   all issues, 27 fact witnesses.  And akin to the discussion we

11   just had on Twombly and PRE, the case was headed to the

12   fact-finder.  There were no dispositive legal issues.  There

13   was no full summary judgment motions.  All the summary judgment

14   motions were partial.  Even if the Defendants had won every

15   last summary judgment motion, the case still would have had to

16   go to the fact-finder.

17          Second, I think this is also a very interesting

18   point.  Peculiarly, the Plaintiffs in this case, in the

19   antitrust case, the way they have come at their allegations of

20   the baseless litigation is to do something pretty curious.

21   They have copied all of the Defendants' arguments or most of

22   the Defendants' arguments in the underlying patent case, so

23   they have basically taken one side of the caption and basically

24   said everything on this side of the caption is correct or a

25   right position.  And then the other side, the Solvay side they

1    either ignore or they slap a conclusory label on it that if

2    Solvay argued it was baseless and so it doesn't count for

3    anything.

4          We would submit to the Court that the Court need not

5    indulge in that exercise.  First, the mere labeling of the

6    Solvay positions as objectively baseless fails under the Iqbal

7    test.  That conclusory allegation can be stripped right out of

8    the case.  Second, this slight of hand would basically render

9    any subsequent antitrust attack on the litigation would mean it

10   could never get dismissed on a motion to dismiss context

11   because you could always adopt the one side of the caption and

12   say the other side of the caption is baseless; and that's not

13   the case.  And that's why I think again the Supreme Court in

14   the teaching in Iqbal about putting everything together in

15   context and making it plausible is so relevant to this

16   particular case.

17         Third fact, this Court entered a consent judgment

18   with respect to the settlement of Par and Paddock and Solvay.

19   And under the prevailing law of this circuit, a consent

20   judgment can only be entered if the Court determines that's a

21   reasonable factual and legal determination based on the record.

22   I think the only point we are trying to make here is that it

23   was a reasonable settlement.  As Mr. Ryan indicated, the patent

24   expiration was 2020.  The settlement date provided for 2015.

25   It was a midrange and clearly a reasonable settlement of that

1    underlying dispute.

2           Fourth, as I alluded to earlier, the fact that the

3    Plaintiffs only added the sham litigation claim when they were

4    before this Court and subject to the Schering-Plough precedent

5    certainly is a relevant fact in understanding the context of

6    this case.

7           Fifth, the actions of the generics themselves.  The

8    generics fought this case for three years.  The generics never

9    pursued a Rule 11 motion.  They never pursued an abuse of

10   process motion.  While there was a boilerplate allegation in

11   the answer, there was never any pursuit of an antitrust

12   counterclaim.  Watson had the right to launch at risk after the

13   expiration of the 30-month stay.  It never did it.  I

14   acknowledge, Your Honor, that none of these facts is

15   dispositive as a matter of law; but they are all highly

16   relevant facts under the Iqbal context specific test that the

17   Supreme Court has said that should apply here.

18          And, finally, in the context point we have the

19   investigation of the FTC.  Mr. Ryan already noted that the FTC

20   has made it one of its policy missions to try to overturn the

21   Schering-Plough case.  The FTC did a very extensive

22   investigation.  They collected millions of documents from all

23   three Defendants or in the aggregate collected millions of

24   documents from the three Defendants.  They took investigatory

25   hearings which are essentially depositions of over 20 party

1    witnesses.  They took third-party witnesses.  And despite all

2    of this investigation, the FTC has not alleged baseless

3    litigation.

4            The private Plaintiffs, Your Honor, however, have;

5    and the private Plaintiffs have had access to no non-public

6    materials.  The private Plaintiffs have only seen the

7    underlying patent record and whatever allegations were in the

8    FTC complaint and perhaps whatever the public investigations

9    they've done.  But, again, an important factor.

10           As I have just mentioned, that brings all the list of

11   context factors.  We recognize that any one of those context

12   factors does not necessarily mandate as a matter of law that

13   the case be dismissed.  But these are the kind of factors that

14   the Supreme Court is looking for the Court to -- the trial

15   court to apply in its common sense.  And I think taken together

16   in the aggregate all of these context factors just provided an

17   overwhelming picture that these baseless litigation claims are

18   an afterthought and should be dismissed.

19           If I turn briefly, and I'll do this very briefly from

20   the objective -- from the context arguments to looking at the

21   underlying patent merits, I won't repeat all of how hard fought

22   and how protracted the underlying litigation was.  But I think

23   it is important again to note that the case as it was sitting

24   before Your Honor on the day it was settled was headed to the

25   fact-finder no matter what Your Honor decided.  And that if we

1    go back to the PRE standard means that the case can't be

2    objectively baseless.

3         And I think it's important that what we're saying to

4    Your Honor particularly at this stage is not that you have to

5    get into the merits of the underlying patent litigation.  You

6    don't have to decide who was right and who was wrong.  You

7    don't have to decide the patent issues.  I think the only thing

8    that Your Honor need do is look at the underlying record, draw

9    on your experience and just acknowledge that it was a dispute.

10   And I'm happy, Your Honor, to go through each of the four legal

11   issues that were in dispute there.  They're in the brief.  I

12   think there are obviously two sides to that story.  But I won't

13   do that unless Your Honor has questions on the specific merits.

14        Let me sum up and just say that the Plaintiffs are

15   essentially asking this Court to disregard everything that it

16   knows from the patent litigation.  They're asking this Court to

17   look at one side of the caption, that the allegations that are

18   made are merely copied out of the Plaintiffs' complaint.

19   There's nothing in the Plaintiffs' complaints about the

20   baselessness of the litigation that don't come from arguments

21   the generics made, yet the generics never took the steps that

22   the private Plaintiffs are taking here.  And labeling -- the

23   conclusion on Solvay's side of the argument is just a legal

24   conclusion that is not entitled to any deference by this Court.

25        So we would suggest to this Court on the basis of

1   both those arguments, either one of those arguments and

2   certainly the two together that this Court should dismiss the

3   Plaintiffs' baseless litigation claims at this stage.

4        Thank you, Your Honor.

5        THE COURT:  Thank you Mr. Sunshine.

6        MR. GIDLEY:  Your Honor, Mark Gidley for Par and

7   Paddock.

8        Your Honor, Par and Paddock join in the arguments

9   made about the trilogy of 11th Circuit precedent with a

10  settlement that takes five years off the patent making this

11  case ripe for dismissal solely on the proposition of

12  Schering-Plough.  And, further, Your Honor, as far as the sham

13  argument in addition to the points made in the foregoing

14  presentation, it's also the case that as a generic Defendant we

15  can only be the victim of any kind of sham litigation.  Of

16  course, Your Honor having lived through this for three years

17  knows there was no sham litigation.  However --

18       THE COURT:  Well, Mr. Gidley, I have got a question

19  about that.  I mean, clearly if it is sham litigation in the

20  sense that a patentee is suing a competitor and the allegation

21  is that the holder of the patent is engaged in sham litigation

22  obviously it's only the holder of the patent that can do that.

23  But in the context of whether or not there's an exception to

24  the Schering-Plough doctrine, I'm not quite so sure that your

25  argument about you can't be liable is supported in the case

22

1   law.

2           MR. GIDLEY:  Well, Your Honor, let's assume for a

3   second that there is some kind of a sham exception.  I think

4   whatever that sham exception is -- and the 11th Circuit hasn't

5   had a case with a holding saying this one was a sham -- it

6   would nonetheless be constrained by the Supreme Court's

7   objectively basis and subjective factors.  Here, Your Honor --

8           THE COURT:  Well, I think that's right.  That PRE

9   case, that did involve as I recall a claim where it was the

10  filing of the litigation itself that was the alleged antitrust

11  violation.  Here I think what the Plaintiffs are arguing is

12  it's not the settlement of the litigation that's the antitrust

13  violation, it's the agreement about dividing up the market

14  which is the antitrust violation which you are a party to.

15          MR. GIDLEY:  That's right, Your Honor.

16          And maybe I should go to the heart of the matter and

17  make sure if I have not addressed the Court's question I can

18  circle back to it.  But the way we look at it is twofold.

19  First, we are entitled to the effective immunity that the FTC

20  argued the Schering-Plough case grants us under

21  Schering-Plough.  That's point one.  But point two is we are

22  entitled to the absolute immunity as the Supreme Court called

23  it in Allied Tube that attaches with Noerr-Pennington.  And the

24  crux there, I think the fulcrum for the argument is does the

25  consent judgment entered into the patent settlement, the

1  resolution for Par and Paddock, does it disclose an order that

2  we refrain from practicing the patent art until 2015.  Indeed,

3  it does, Your Honor.  The order at paragraph 6 details the

4  entry date conditions for entry by Par or Paddock in 2015 or

5  2016.  And, in fact, we're ordered not to practice the patent

6  unless the 6(b) condition, another generic entry occurs.

7          We believe it is clear under the case law -- and I

8  will give you the precedence.  We primarily rely, Your Honor,

9  on MedImmune and Andrx Pharmaceuticals; but it's conceded by

10  the FTC the judicial action like any other governmental action,

11  action by Congress, that sort of action once it's done, once

12  there's valid governmental action immunity attaches.

13          Here, Your Honor, we subjected ourselves to a consent

14  judgment.  We could have simply done a settlement agreement,

15  but Par and Paddock submitted to the Court's jurisdiction.

16  And, in fact, Par was not a party in the patent infringement

17  case.  It showed up and said, Your Honor, here's the deal,

18  we've got a resolution with this branded company and we can

19  come in in February of 2016 and under some circumstances August

20  of 2015.  And we proposed that consent judgment.

21          Your Honor ordered that consent judgment which had

22  the following legal effects under Stovall and other precedence

23  of the 11th Circuit.  First, Your Honor, the consent judgment

24  unlike a mere settlement resolution is res judicata of the

25  matter City of Miami, 5th Circuit, 1981.  Second, Your Honor,

1   we submitted ourselves to the scrutiny and continuing

2   jurisdiction of this Court.  So if the Court had questions

3   about the resolution, the Court was free to do that.  We were

4   not going to get this consent judgment approved without

5   satisfying the Court.

6          Third, we are under an injunction.  Your Honor's

7   order, the consent judgment, is a future injunction.  As

8   Stovall puts it at 1242:  By virtue of its injunctive

9   provisions, a consent decree reaches into the future and has

10  continuing effect.

11         Fourth, of course, if we violated Your Honor's

12  consent judgment, that would be punishable by contempt.

13         Now, the complaints allege only an agreement

14  postponing generic entry until 2015 and 2016.  The FTC's right

15  upfront about that.  Paragraph one of the FTC's second amended

16  complaint:  This case challenges agreement by Watson, Par and

17  Paddock to delay until 2015 the sale of low-cost generic

18  AndroGel.

19         Similarly, the direct class purchasers, paragraph

20  two:  Solvay entered into agreements with the generic

21  Defendants.  Through these agreements, the generic Defendants

22  agreed not to compete with Solvay's AndroGel product until at

23  least 2015.

24         And, similarly, Your Honor, the same allegation

25  appears in the indirect purchaser complaint.  That's paragraph

1   two of the Fraternal Order complaint, paragraph ten of the

2   Scurto complaint and paragraph 71 of the UFCW complaint.  The

3   gravamen of this case is an agreement by the parties which

4   restrains generic entry until 2015.  That's exactly what order

5   paragraph 6 and A, B and C does.

6          The case law and the two cases that we rely primarily

7   on on this point, Your Honor, certainly, of course, judicial

8   resolutions are part of the Noerr-Pennington doctrine.  That's

9   conceded by the FTC.  California Motor Transport, the Andrx

10  opinion by the 11th Circuit has held to that fact.  It applies

11  in this context.  Andrx Pharmaceutical versus Biovail, Your

12  Honor, at 818 -- and this is the D.C. circuit Andrx.  It's

13  confusing.  There are two Andrx.  If an anti-competitive harm

14  is caused by a decision of the Court even though granted at the

15  request of a private party, no private restraint of trade

16  occurs because the intervening governmental action breaks the

17  causal chain.

18         And, similarly, the MedImmune decision in California

19  states:  Unlike settlement agreements under 41(a), a consent

20  judgment means the very anti-competitiveness of the agreement

21  depends on the government exercising its discretion to create

22  an anti-competitive result.

23         We certainly are immune under the effective immunity

24  of Schering-Plough.  We are also entitled to the immunity, Your

25  Honor, of the Noerr-Pennington doctrine.

1          And with that, Your Honor, we'll reserve the rest of

2     our time on rebuttal.  But my colleague, Mr. Grannon, would

3     address the second and final argument.

4          MR. GRANNON:  Good afternoon, Your Honor.  Eric

5     Grannon for Par Paddock.

6          I will briefly address, Your Honor, our second filer

7     argument which we believe is another independent basis for

8     dismissal of Par Paddock and, frankly, Your Honor, an important

9     means for insulating these smaller companies from the FTC's

10    stated desire for a litigation vehicle to overturn the

11    circuit's precedent.  Just very briefly, Your Honor, if it's

12    helpful to the Court, I will draw the Court's attention on the

13    point Your Honor raised about the applicability of sham

14    allegations to the generic Defendants and what that means to

15    the Schering-Plough standard.

16         At pages 18 through 19 of our motion to dismiss

17    against the direct purchasers, Your Honor, we go into some

18    detail about why we think that doesn't make sense and how it

19    would not make sense to impose a burden on generic Defendants

20    to somehow investigate the objective and subjective basis for

21    the patent holders' enforcement and why we think that would not

22    be workable, Your Honor.

23         On the second filer point, Your Honor, it basically

24    boils down to three points demonstrating that the FTC and the

25    private Plaintiffs have not plausibly alleged harm to

1   competition from second ANDA filer Par Paddock entering at the

2   same time as first filer Watson.  First, Your Honor, it's

3   Congress that designed the Hatch-Waxman regulatory scheme being

4   the first ANDA filer had 180 days of marketing exclusivity, a

5   monopoly, if you will, and thereby also keeps all subsequent

6   ANDA filers off the market until after a first filer's entry,

7   Your Honor.

8          Second, because of this Hatch-Waxman regulatory

9   structure, even accepting, Your Honor, the FTC's theory that

10  settlement providing for generic entry prior to patent

11  expiration, that that entry prior to patent expiration could

12  nonetheless somehow cause anti-competitive delay, a second

13  filer settlement, Your Honor, could only cause such delay if it

14  provided for entry by the second filer after the first filer.

15         Third, and, finally, Your Honor, ignoring this

16  regulatory scheme, the FTC's and private Plaintiffs' sole

17  allegations of competitive harm against Par Paddock are a

18  series of hypothetical scenarios in which Par Paddock would

19  have entered earlier.  For reasons I'll address briefly, Your

20  Honor, we respectfully suggest that these hypotheticals should

21  not be entertained by the Court.  And in any event, each is

22  implausible.

23         Briefly, Your Honor, on the first point I will spend

24  just a moment on the operation of the first filer's 180-day

25  exclusivity.  If the first filer settles with the patent

1   holder, all subsequent ANDA filers are effectively blocked,

2   Your Honor -- the industry term is bottlenecked -- for entering

3   180 days after the first filer settlement entry date.  And

4   that's what happened here, Your Honor.  Solvay and Watson

5   reached an agreement on the 2015 entry date.

6          With one generic coming on, Solvay didn't have much

7   to lose from another.  So Solvay offered the same date to Par

8   Paddock or based on the same date as Watson had with Par

9   Paddock.  And that left Par Paddock with only two choices:

10  Accept Solvay's offer that was based on Watson's entry date or,

11  two, continue litigating the already three-year-old case

12  needing to win both in this court, Your Honor, and also at the

13  Federal Circuit.

14          And even assuming that Par Paddock could have pulled

15  off that litigation a year ago winning here and at the Federal

16  Circuit cleanly with no remand, Par Paddock under the pre-MMA

17  -- for the court reporter's benefit, that's M-M, those are M's

18  like Mary -- MMA amendments to Hatch-Waxman under the pre-MMA

19  Hatch-Waxman regime, Your Honor, Par Paddock would still have

20  to sit back and wait for Watson to enter and enjoy the 180-day

21  exclusivity.

22          Now, that's the only incentive that Congress provided

23  in this Hatch-Waxman regime for generics.  So it doesn't make

24  sense that Par Paddock would have funded this litigation for

25  Watson to sit back and enjoy those benefits.

1          The Mova case that we cited at pages 18 through 19 of

2     our motion against the FTC, Your Honor, is very clear on this

3     point.  One difficulty is that the 180-day exclusivity period

4     will seemingly always go to the first applicant no matter whose

5     suit satisfied the Court's decision.  It seems odd to reward

6     the first applicant if some later applicant is the party that

7     actually prevailed in the patent infringement litigation.

8          And Congress recognizes statutory disincentive to

9     subsequent ANDA filers to continue to litigate.  So Congress in

10    December 2003, Your Honor, changed the Hatch-Waxman Act; and

11    those are the MMA amendments that I have referred to here and

12    in our papers.  Those do not apply here indisputably, Your

13    Honor.

14         Now, that's the regulatory background; and it helps

15    demonstrate why the date that Par Paddock obtained entry at the

16    same time as the first filer is a better result than even

17    Congress intended, Your Honor.

18         Now, if I could direct the Court's attention to the

19    chart of page 20 of our motion against the FTC.  And if the

20    Court's interested, I have a freestanding copy here, Your

21    Honor.

22         THE COURT:  All right.

23         MR. GRANNON:  If I could approach.

24         And, again, this is at page 20 of our brief, Your

25    Honor.  I have got copies here for counsel.

1          If you look at that chart, Your Honor, you can see

2     that in contrast to the other cases brought by the FTC the

3     second filer here enters at the same time as the first filer,

4     so there can't be any anti-competitive delay.  In the first

5     line on the chart, Your Honor, in Schering-Plough, for example,

6     the second filer AHP settled for a date 28 months after the

7     first filer.  And the FTC accordingly alleged that 28-month

8     period constituted anti-competitive delay.

9          In the second example in the chart, Your Honor, in

10    the Cephalon case Watson is the second filer there with an

11    entry date of six months after the first filers.  Now, arguably

12    that six-month period should not be considered anti-competitive

13    delay because it results directly from the 180-day exclusivity

14    period.  In any event, here, Your Honor, in this case there is

15    no daylight whatsoever between Par Paddock's entry date and the

16    first filer's.  So there just isn't any basis to attribute any

17    competitive harm to Par Paddock's generic entry.

18         Now, the FTC tries to overcome this inability to

19    allege anti-competitive harm plausibly with three hypothetical

20    scenarios.  In paragraph 94 of the second amended complaint,

21    Your Honor -- and that's quoted in full on page 22 of our

22    briefing at the FTC -- just very quickly, Your Honor, these

23    hypothetical allegations of competitive harm should really be

24    discounted.  Schering-Plough, for example, quotes that rule

25    from the Supreme Court's Cal Dental decision which is at page

1    23 of our brief.

2            Furthermore, Your Honor, the Court we respectfully

3    suggest should be skeptical of these allegations because the

4    allegations of competitive harm in paragraph 94 against Par

5    Paddock are lifted verbatim, Your Honor, from paragraph 93

6    against Watson.  All the FTC did was change the names, Your

7    Honor.  And that type of boilerplate allegation we respectfully

8    suggest shows that the FTC has not accounted at all the

9    statutory distinction between first and subsequent ANDA filers

10   that Congress recognized that was obviously quite important.

11           Now, very briefly, the three allegations are

12   implausible.  First, the FTC says that rather than settling Par

13   Paddock would launch at risk.  But as a matter of law, Your

14   Honor, only Watson had the requisite FDA approval to launch at

15   risk.  And the FTC effectively concedes this at paragraph 52 of

16   the second amended complaint where there it only alleges that

17   Watson had the requisite approval for launch.

18           Second, Your Honor, the FTC hypothesizes that Par

19   Paddock would continue litigating after a Watson settlement and

20   that Par Paddock had "ample financial incentive" to do so.

21   Now, this hypothetical goes right back to the point I just

22   made.  Congress amended the Hatch-Waxman Act precisely for this

23   reason in December 2003.  It recognized the statutory

24   disincentive to subsequent ANDA filers for continued litigation

25   after a first filer settlement and changed the law.  So the

1    FTC's hypothetical allegation is really at loggerheads with

2    Congress's determination that second filers, subsequent filers

3    did not have such an incentive.

4           The final hypothetical, Your Honor, is that if Par

5    Paddock had not entered contemporaneous business transactions

6    that somehow Par Paddock would have gotten a better entry date.

7    And I think I'll just rest there by saying that this circuit's

8    authority is clear that this type of supposition is really

9    untenable, Your Honor.

10          So if the Court has no questions, Your Honor, I'll

11   just conclude by saying that a second filer coming in at the

12   same time as the first filer in a regulatory reality of

13   Hatch-Waxman, particularly before the MMA amendments of

14   December 2003, Your Honor, that's a pro competitive outcome

15   coming -- the second filer coming in at the same time as the

16   first filer.

17          Thank you, Your Honor.

18          THE COURT:  All right, Mr. Grannon.

19          Is that it for the initial arguments for the

20   Defendants, Mr. Ryan?

21          MR. RYAN:  Yes, it is, Your Honor.

22          THE COURT:  Are you going first, Mr. Canfield?

23          MR. CANFIELD:  I am, Your Honor.  And I really have

24   only two points to make.

25          The first point is that while the private Plaintiffs

1   and the FTC actions are quite similar there are some obvious

2   and significant differences.  The FTC's purpose in filing suit

3   was to get injunctive relief to benefit consumers by bringing

4   the price down as quickly as they can.  They have asserted a

5   very narrow case and focused on the simple issue, relatively

6   straightforward issue of whether the settlement agreements in

7   the patent litigation are anti-competitive.

8           In the private case, private Plaintiff cases, we're

9   seeking damages.  And while we agree that those settlement

10  agreements were anti-competitive, our allegations are much

11  broader.  And they're much broader than the issue of sham

12  litigation.  Our contention is that Solvay started a scheme

13  that was designed to delay generic competition on the market.

14  It began with the improper listing of AndroGel on the FTC's

15  Orange Book.  The scheme continued through the filing of sham

16  litigation in order to improperly obtain the 30-month stay

17  under Hatch-Waxman, and it culminated in the settlement

18  agreements.

19          So we're not focused just on the settlement

20  agreements.  We are not just focused on the sham litigation.

21  It's broader.  We have also alleged that the generic Defendants

22  have entered into anti-competitive activity on their own by

23  agreeing among themselves that neither of them would continue

24  to attempt to market a generic version of AndroGel.

25          My second point deals with this patent litigation

1   that goes before the Court, and that litigation ended in at

2   least in my experience -- and the Defendants have asked us to

3   draw upon our experience -- my experience is that the

4   settlement in that case the way that case ended was very

5   unusual.  The parties could have come to the Court and filed

6   stipulations of dismissal.  The Watson -- in the Watson case,

7   they did that.  In the Par Paddock case, they asked this Court

8   to enter a consent judgment.

9           And that consent judgment was a little bit weird.  In

10  my experience, what the Defendant always says in litigation is

11  we don't have any liability.  We'll settle with you, but we are

12  not going to admit we did anything wrong.  In this consent

13  judgment, what happened is Par and Paddock came in and said

14  these are valid patents so we would be infringing if we went

15  and did what we were planning to do in this case.  It's very

16  unusual.

17          They also asked the Court in the consent judgment to

18  make some findings about how they were acting in the public

19  interest which I don't usually see in cases that involve

20  private parties.

21          So why would they go to the trouble of doing all

22  that?

23          THE COURT:  Noerr-Pennington.

24          MR. CANFIELD:  That's exactly right, Your Honor.

25  They knew what they were doing.  They wanted to make it appear

1  as if this -- what they had done was blessed by the Court, and

2  they wanted to be able to wave around that consent judgment and

3  try to convince people not to come after them.

4         We don't know what the lawyers told the Court at the

5  time that that consent judgment was entered.  There apparently

6  were some telephone conferences.  The minute orders and the

7  transcripts are under seal, so we haven't seen them.  But I

8  doubt these Defendants told the Court that their agreements

9  were likely to be challenged as anti-competitive.  I doubt they

10  submitted the agreements themselves to the Court.  I doubt that

11  Solvay told Your Honor that they were paying more than a

12  hundred million dollars in order to avoid a finding one way or

13  another as to whether their patent was viable or not.  I don't

14  think they told the Court all that.

15         And three years ago they were able to keep what they

16  did hidden from the light of day.  If the Court will deny the

17  motions to dismiss, we'll have an opportunity to do now in this

18  case what this Court we believe was prevented from doing back

19  then which is to look at the substance of these consent -- this

20  consent judgment, look at what actually happened and make a

21  determination as to whether it was in the public interest and

22  whether it complied with federal antitrust laws.

23         That's all I have to say, Your Honor.

24         THE COURT:  Thank you, Mr. Canfield.

25         MR. MEIER:  Good afternoon, Your Honor.  My name is

1   Markus Meier, and I am here on behalf of the Federal Trade

2   Commission.

3           THE COURT:  Good afternoon, Mr. Meier.

4           MR. MEIER:  May it please the Court.

5           I think I have got 30 minutes allocated by agreement

6   with the other Plaintiffs, and I'll ask Mr. Canfield to give me

7   the hook if I start running excessively beyond those 30

8   minutes.  Let me give a quick overview of the -- how I intend

9   to proceed.  Of course, I will be happy to answer any questions

10  that Your Honor has.

11          First question I'm going to try to answer is why is

12  the FTC here.  It could very well be that Your Honor thought

13  you had gotten this case off your docket back in 2006 when the

14  parties settled their litigation, and suddenly here we are in

15  2010 right back in your court again talking about some of the

16  same issues that were being talked about back in 2006.  I'd

17  like to give you a little bit of explanation about why that is.

18          Next I will address the Defendants' arguments

19  regarding the 11th Circuit precedent and why Your Honor should

20  not adopt their reading of that precedent.

21          Third, I would intend to address Par's Noerr

22  arguments.  That's the argument through which Par's arguing

23  that your consent judgment immunizes their anti-competitive

24  conduct that's contained and embodied in the agreement that

25  they had entered into with Solvay, the payment agreements that

1  Your Honor made a reference to a moment ago.

2          And, fourth, time permitting, address Par's attacks

3  on the sufficiency of the FTC's complaint based on the Twombly

4  case and also the second filer status.  And I'll try to explain

5  that a little bit more again if there's time permitting.

6          I think it's a fair question that might be on Your

7  Honor's mind to ask why is the FTC here to begin with.  As I

8  said, you might well have thought this case ended back in

9  September 2006.

10          I'd like to be very clear upfront the FTC is not

11  anti-settlement.  The FTC is not anti-patent.  In fact, as we

12  have alleged in paragraph 101 of our complaint, patent

13  litigation can be and often is settled without raising any

14  antitrust issues.  But Congress passed the Medicare

15  Modernization Act in 2003.  Mr. Grannon referred to that as the

16  MMA, the Medicare Modernization Act.  That's the same act that

17  created Medicare Part B which gives senior citizens the drug

18  benefit.

19          That act requires drug companies like the Defendants

20  here that enter into agreements with certain terms to file

21  those agreements with the Federal Trade Commission and the

22  Department of Justice.  These agreements have to be filed

23  whether they occur in the context of litigation or not.  It

24  doesn't matter whether it's litigated or not.  The question is

25  what's the nature of the agreement and what's contained within

1   that agreement.

2          And Solvay, Watson and Par Paddock filed their

3   agreements with the FTC pursuant to their obligations under the

4   act.  And Congress requires that the FTC review those.  And it

5   is actually my office, the office I head, that does so.  And we

6   have been reviewing those agreements since the requirement

7   kicked in in 2004.  So that was two years before the settlement

8   occurred in this case we had started reviewing these types of

9   agreements as they have been filed with us.

10          Congress requires these filings under the Medicare

11  Modernization Act because of concerns that it had that branded

12  and generic companies are entering into anti-consumer

13  agreements that delay generic competition.  And, of course,

14  this raises the cost of prescription drugs to individuals.  It

15  raises the cost of prescription drugs to those who pay for it,

16  including government programs and employers.

17          And the very type of agreement we allege -- and we

18  set this forth in paragraphs 1 through 6 of our complaint and

19  actually all throughout our complaint -- the very type of

20  agreement that the Defendants entered into here was a payoff.

21  Solvay paid off Watson and Par to generic companies millions of

22  dollars to abandon their patent litigation, litigation that was

23  here before this Court, and to refrain from launching their own

24  lower-cost versions of a drug called AndroGel costing American

25  consumers millions of dollars.  That's why we are here.  These

1    factual allegations, of course, must be accepted as true for

2    the purposes of the motion to dismiss.

3            You have heard a little bit of discussion about the

4    Hatch-Waxman Act, and I'm not sure how familiar Your Honor is

5    with the Hatch-Waxman Act.  It does loom large in the

6    background of this case --

7            THE COURT:  Well, I think y'all all did a good job of

8    describing that.  There's one sentence in the indirect

9    purchaser's complaint that I don't understand.

10           MR. MEIER:  I can certainly take a shot at it.

11           THE COURT:  You can explain it to me or somebody

12   else; but it's page 41 of the complaint, paragraph 88.  And it

13   says:  Under Hatch-Waxman their new dosage form exclusivity was

14   set to expire on February the 28th, 2003.

15           That I don't understand.

16           MR. MEIER:  Your Honor, I will have to leave it to

17   the others to explain.

18           MR. GERSTEIN:  Your Honor, I'm going to address that

19   during my whole presentation.

20           THE COURT:  Fine, fine.

21           MR. MEIER:  But we lay out a lot of the detail about

22   the Hatch-Waxman context in paragraph 17 through 23 of our

23   complaint.  But I think it's worth just focusing on one aspect

24   of it.  One aspect of the act was that Congress wanted to

25   increase the availability of generic drugs again because they

40

1    often reflected big cost savings to everybody who pays for

2    prescription drugs in the United States.  And it did so by

3    creating a special set of procedures to facilitate patent

4    challenges.  These are often referred to as paragraph 4

5    filings.  You may have seen that.

6         And the very settlement -- the very litigation that

7    was involved before Your Honor was in paragraph 4 involving

8    paragraph 4 of the Hatch-Waxman Act.  These were the procedures

9    that Watson and Par, the generic companies, had invoked in

10   challenging Solvay's AndroGel formulation patents giving rise

11   to the lawsuit that is before Your Honor.

12        And as we allege in paragraphs 24 through 29,

13   Congress recognized that there was significant savings to

14   consumers and our health care system from generic drugs.  And

15   as we allege in paragraph 30, Congress also recognized that

16   some patents on some drugs aren't really all that.  Thus,

17   Congress created financial incentives for generic companies to

18   go looking for branded patents that may not really be valid or

19   to try to invent around patents that don't really have much

20   scope, don't cover very much and that are easily circumvented

21   by inventing around them.

22        The point of the paragraph 4 filing that Congress

23   created was to facilitate generic entry prior to patent

24   expiration.  It's an understanding that it's sometimes possible

25   for generics to get into the market before the patents expire.

1    But according to Defendants, absent proof of sham litigation a

2    brand can use its monopoly profits to purchase generic

3    exclusion right up to the point that the patent expires.

4    Patent expires in 2020.  They could have bought protection

5    right up to 2020 so that anybody could enter only after the

6    patent had expired.

7            And under the Defendant's standard, even a trivial

8    patent, one that's likely to be invalid or not infringed, gives

9    the patentee the right to buy protection from competition from

10   as many other competitors as it wants for as much money as it

11   wants to spend right up to the expiration of the patent term so

12   long as the infringement claim is not a sham.

13           So let's turn a little bit to the 11th Circuit

14   precedent.  Obviously, the 11th Circuit decisions in Valley

15   Drug, Schering and Andrx are controlling precedent.  That's

16   beyond dispute.  It was interesting that Mr. Ryan never

17   actually spoke about Valley Drug.  He talked about Schering.

18   But actually all of those are controlling precedent for this

19   Court.

20           The real issue is how to read those decisions.  And

21   Mr. Ryan made much of the fact, and it is true, that the FTC

22   has read the 11th Circuit's decisions in other cases

23   differently than the way I'm advocating for today, Your Honor.

24   That is absolutely true.  We acknowledge that that we took in

25   our position in our appeal to the Supreme Court that the 11th

1    Circuit appeared to adopt and under the patent term standard.

2    Frankly, if you spend time looking at that, some courts and

3    other writings on this, the 11th Circuit decisions have been

4    read differently by many people, not just the FTC.  But, of

5    course, the only reading that really matters here, Your Honor,

6    is the reading that you give to these decisions.

7           According to Defendants, the controlling 11th Circuit

8    precedent absent sham infringement allegations or fraud on the

9    Patent Office in procuring a patent, a settlement litigation is

10   immune from antitrust laws so long as it does not delay entry

11   -- and this is their words in their motion -- beyond the end of

12   the patent life.  In effect, what Defendants are saying is that

13   a patent holder like Solvay is entitled to use its monopoly

14   profits to buy protection from competition until the patent

15   expires and that Solvay can do this regardless of the strength

16   of its patent.  It's saying don't look at the strength of the

17   patent, we can do this -- as long as the patent runs 'til 2020,

18   we can do it to 2020.

19          Under Defendants' end of the patent term standard

20   which even Mr. Sunshine acknowledges a very narrow exception,

21   it makes no difference whether the patent is likely to be found

22   invalid.  It makes no difference whether Watson and Par

23   Paddock's generic products are likely to be found not to have

24   infringed Solvay's patents.

25          Indeed, under the Defendants' standard -- this is in

1    their motion to dismiss at page 17 -- this Court need not

2    consider the complaint's allegations that Solvay's patents

3    were, quote, unlikely to prevent generic entry when determining

4    the scope of the exclusionary potential of patent as we have

5    alleged in paragraphs 86 through 92.  That's where we allege

6    that it was unlikely that Solvay's patents would have kept the

7    generics out.  And it's alleged in quite a bit of detail, Your

8    Honor.  And I'd again refer to paragraphs 86 through 92.

9             THE COURT:  Well, now, Mr. Meier, would you agree

10   that that's a little more lenient standard than the no

11   reasonable litigant would expect to succeed on the merits of

12   the case?

13            MR. MEIER:  Lenient in whose direction?

14            THE COURT:  In yours, in your direction.

15            MR. MEIER:  Let me see if I can understand.  Maybe I

16   could hear that again.

17            THE COURT:  I think you're arguing for a more

18   forgiving standard for sham litigation than the Supreme Court

19   adopted in the whatever it is, the REM or whatever --

20            MR. MEIER:  No, I'm actually not at all trying to

21   argue for what the Supreme Court meant when it talked about

22   sham.  So if that's how Your Honor understood the arguments so

23   far, I'm not addressing myself at all to what the sham standard

24   is.  I will be addressing myself and I am trying to address

25   myself to what the 11th Circuit has said what you do in a case

44

1    like this when you are confronted with an agreement of the

2    nature that the Defendants have entered into.

3         THE COURT:  So you are saying that some standard

4    below sham litigation is the effective standard in the 11th

5    Circuit?

6         MR. MEIER:  Yes, Your Honor.  I'm saying --

7         THE COURT:  That's what I thought you were saying.

8         MR. MEIER:  In fact, let's turn right to it.  Let's

9    look exactly at the plain language of the 11th Circuit because

10   the 11th Circuit, if you go looking for it, Your Honor, you are

11   not going to find a lot of discussion about the sham standard.

12   I grant you you will find that in some other circuits, and

13   Mr. Ryan's already made reference to that.  You will find that

14   in the 2nd Circuit's decision.  You will find that in the

15   Federal Circuit's decision.  They used the language sham

16   standard.  It's very clear.

17        And so when a court wants that to be the standard,

18   courts have no problem saying that's the standard.  But that's

19   not what the 11th Circuit did.  In fact, let's just take a

20   quick look at this.

21        The place to start is, of course, with Valley Drug

22   because that was the first case of this type that was brought

23   here in the 11th Circuit and which Mr. Ryan never mentioned.

24   And there the language is, "Plaintiffs' arguments require

25   consideration of the scope of the exclusionary potential of the

1    patent, the extent to which these provisions of the agreements

2    exceed the scope and the anti-competitive effects thereof."

3    The word sham doesn't show up in there.  It talks about the

4    scope of the exclusionary potential of the patent, Valley Drug

5    at 1312.

6            In Schering-Plough -- this was a case that the FTC

7    brought and we lost here in the 11th Circuit -- the court there

8    says, "We are bound by our decision in Valley Drug.  Therefore,

9    in line with Valley Drug we think the proper analysis of

10   antitrust liability requires an examination of, one, the scope

11   of the exclusionary potential of the patent; two, the extent to

12   which the agreements exceed that scope; and, three, the

13   resulting anti-competitive effects."

14           That's at 1065 through 66.  Again, the word sham

15   doesn't appear.  What does appear --

16           THE COURT:  Well, it doesn't appear because sham

17   litigation as I understand it is a narrow exception to the

18   immunity that otherwise comes if the exclusionary conduct is

19   within the scope of the patent.  That's the way I understand

20   it, which is two different things.

21           MR. MEIER:  Right.  But what I'm focusing on is what

22   does that mean, the exclusionary scope of the patent.  Are

23   those two different things?

24           And I think Your Honor is saying, yes, they are two

25   different things.  And if that's the case, Your Honor, I

1   absolutely agree.  They are conflating them.  They are saying

2   they are the same thing.  I am saying the exclusionary scope of

3   the patent is something different than the sham standard.

4   That's exactly what we're saying.

5           And so what do the plain words of the scope of the

6   exclusionary potential of patent mean?

7           It means you take a look at the patent.  It can mean

8   taking a look at what does this patent cover, what's the

9   language of the patent, what does the patent cover, what

10  property rights do they have as a result of this patent and how

11  does that compare to what the generic companies are proposing

12  to do.  It requires some consideration of the validity of that

13  patent and some consideration of infringement.

14          THE COURT:  I think that's where the Defendants and

15  you differ, Mr. Meier.

16          MR. MEIER:  Exactly.  That's exactly right, Your

17  Honor.  We differ because they say sham standard, that's it,

18  you put the blinders on, you don't look at the patent.  And we

19  are saying, well, wait a minute, that's not what the 11th

20  Circuit said.  I have just read it from Valley Drug.  I have

21  just read it from Schering.  And there's the third case, the

22  last one they brought that came here, Andrx v. Elan, which is

23  the most recent.  And, not surprisingly, it's exactly the same

24  language:  To prevail on a claim that a patent infringement

25  settlement agreement violates Section 1 of the Sherman Act, a

1  Plaintiff must prove the scope of the exclusionary potential of

2  the patent.

3       And not only is Andrx the most recent case here in

4  the 11th Circuit applying the standard, but notably the 11th

5  Circuit said that the District Court improperly dismissed the

6  case on the pleadings.  The 11th Circuit applied the standard

7  that we're advocating for that we think the 11th Circuit said

8  that we're talking about today and held that the Plaintiffs'

9  challenge to an allegedly anti-competitive patent settlement

10 should proceed past the pleadings.  It was improper --

11      THE COURT:  Wasn't there something having to do with

12 the second filing rule where they extended the 180-day period

13 or something like that in that case?

14      MR. MEIER:  There were other factors, and there are

15 other facts in that case that are not at play in this case.  I

16 will grant you that, Your Honor.

17      But the bottom line is if the 11th Circuit had

18 intended to adopt a sham standard as Defendants advocate, it

19 could have said so.  Instead, it adopted a standard that calls

20 for an examination of the scope of the exclusionary potential

21 of patent.  And I invite the Court to think about what does

22 that mean.

23      THE COURT:  You are saying that that means that I

24 look not only at the claims of the patent but the validity of

25 the patent?

1          MR. MEIER:  At least some consideration of the

2     validity and some consideration as to whether a Defendant's

3     products would infringe that patent.  Again, how much does that

4     patent really cover?  Does it cover a very narrow thing that

5     it's easy for somebody to get from Point A to Point B by just

6     walking around that piece of property?  Or do you have to

7     really go across that piece of property to get from Point A to

8     Point B?

9          THE COURT:  Well, that part seems pretty easy to me

10    in this context because in order to get the abbreviated new

11    drug application approved you have got to show that the

12    generic's product, I believe, is the bioequivalent of the

13    branded product.  That's pretty good proof or pretty good

14    indication that the two are the same and that if the patent

15    covers one it's probably going to cover the other.

16         MR. MEIER:  Well, you might think that, Your Honor;

17    but you have to draw a distinction between what's known as a

18    compound patent and what's known as a formulation patent.

19    Compound patent is the aspect of the drug that makes the drug

20    the drug.  Let's say Prozac.  That's always the generic name,

21    fluoxetine.  Fluoxetine is the compound.  Anybody that wants to

22    practice the compound patent, it would be absolutely

23    coextensive.

24         But what's at issue in this case is not the compound.

25    It's not testosterone.  That's the compound in AndroGel,

1    testosterone.  It's been synthesized, and it's been patented a

2    long time ago.  Those patents are long gone.  There are no

3    patents on that anymore.

4         And this product involved a gel formulation.  You can

5    take testosterone gel and put it on your body and get

6    testosterone if you have low testosterone if you are a male.

7    Gel is also long known about.  Those patents are long gone.

8         It's a formulation patent that says you mix a certain

9    amount of testosterone, a certain amount of gel and certain

10   other ingredients.  Well, somebody else can take testosterone

11   and gel, tweak the ingredients a little bit and get roughly the

12   same thing, get something that they can go to the FDA with and

13   say this is bioequivalent.  But it doesn't touch on Solvay's

14   property because Solvay doesn't own a patent on testosterone

15   and Solvay doesn't own a patent on gel.  It owns a formulation

16   patent.

17        And that often happens in a lot of these cases, Your

18   Honor.  So when you go back and read some of these cases, you

19   have to look at the difference.  A lot of these cases involve

20   formulation patents, things like, for example, what gives a

21   24-hour-release pill its 24-hour-release profile.  Well,

22   there's different technologies that can be used to do that.

23        And those are formulation patents.  And generic

24   companies can come a ways to invent around that particular

25   formulation and still go to the FDA and get approval as a

1    bioequivalent because what bioequivalency means is it means it

2    works the same way in the body.  It gets the same uptake and

3    works the same way in the body; and it's the same active

4    pharmaceutical ingredient, the same dosage form, the same

5    strength.  But it does not mean it's exactly the same mixture.

6         We also cite -- and I will go through this very

7    quickly -- in the FTC's briefs that Defendants' reading of the

8    11th Circuit precedence would conflict with Supreme Court law.

9    The Gypsum case and the Glaxo case, in both Glaxo and Gypsum

10   the government like we are here today alleged that the

11   Defendants had entered into anti-competitive agreements that

12   violated the antitrust laws.  The Defendants in those cases did

13   not deny that they've entered the agreements, just as these

14   Defendants don't deny they've entered the agreements, but

15   rather as the Defendants do here they claimed the agreements

16   were merely the legitimate exercise of patent rights.

17        I will grant you Gypsum and Glaxo had nothing to do

18   with the exclusion --

19        THE COURT:  You are kind of asking me to go out on a

20   limb to ignore three 11th Circuit cases and go back and follow

21   a 50-year-old Supreme Court case, Mr. Meier.

22        MR. MEIER:  I was terribly unclear if that's what you

23   thought I was asking, Your Honor.  I am saying read those 11th

24   Circuit cases consistent with the Supreme Court cases, not

25   ignore the 11th Circuit.  I'm saying absolutely you are bound

1  to follow the 11th Circuit precedent.  There is no question

2  about that.  And I have gone through that precedent and shown

3  you how that precedent talks about the scope of the

4  exclusionary area of the patents.  And now I'm saying, by the

5  way, there's some Supreme Court cases that say in government

6  cases where we're bringing an antitrust case and there's a

7  patent at issue you go look behind the patent.  You lift the

8  hood up, and you take a look at it.  So I'm saying it --

9        THE COURT:  Now, Schering-Plough was an FTC case,

10 wasn't it?

11       MR. MEIER:  It was, Your Honor.  It was.

12       So I'm saying read these two consistently because I

13 don't want you to go against the Supreme Court.  I don't want

14 you to go against the 11th Circuit either.

15       THE COURT:  All right, Mr. Meier.

16       MR. MEIER:  And Defendants' reading of the 11th

17 Circuit cases also conflict, by the way, with the way other

18 people have read it.  And perhaps most important for this Court

19 and useful to this Court is to take a look at what the District

20 Court did in the Southern District of Florida in the Terazosin

21 case.  That was remanded from the 11th Circuit.  That's the

22 remand from the Valley Drug case in the 11th Circuit.  They

23 sent it back to a judge like yourself down in Florida.

24       And what did the District Court do in Florida?

25       It held on summary judgment that a patentee exceeded

52

1    the protection of four to five patents, and it violated the

2    antitrust laws by paying competitors not to compete.  They said

3    look at the exclusionary scope of the patent.  District Court,

4    you didn't do that.  Now do it.

5           District Court went and did it in a case very similar

6    to this one.  And notably in that case the Florida District

7    Court explicitly decided that the underlying patent case was

8    not a sham.  It expressly said that that was not sham

9    litigation, but I'm going to take a look at the patent because

10   that's what the 11th Circuit told me to do.  When I take a look

11   at the patent on summary judgment, they found that it exceeded

12   -- the agreement exceeded the protection afforded by the

13   patent.

14          And, interestingly, Defendants themselves have argued

15   that this case should be transferred to Your Honor for this

16   very reason.  As you know, we brought this case originally in

17   California.  The Defendants filed a transfer motion.  Page 14

18   through 15 this is what they said.  "Transfer is also" -- this

19   is what they said to Judge Pfaelzer in California -- "Transfer

20   is also warranted because of the substantial savings in

21   judicial resources that will result from the Northern District

22   of Georgia's familiarity with the underlying patent

23   litigation."

24          Why would they tell her that your familiarity with

25   patent litigation is a reason to come here and now they are

1    telling you, But don't look at the patent, it's the sham

2    standard?

3           In their transfer reply brief, "The court that

4    resolves the government's antitrust allegations must weigh the

5    patent merits."  But now they are telling you don't look at the

6    patent.  It's the sham standard.

7           And Mr. Ryan himself at the transfer hearing before

8    Judge Pfaelzer, page 14 of the transcript, told her, "Now, the

9    patent merits are critical to our venue motion because this is

10   exactly the issue that was tried, that was litigated in front

11   of Judge Thrash for three years, that is to say, what are the

12   merits of the patent."

13          And, finally, Mr. Ryan at the hearing before the

14   Multidistrict Litigation Panel where a lot of the private

15   Plaintiffs were, at page 8 and 9 of that transcript said, "But

16   I must say in all deference to Judge Thrash and his schedule

17   there were three years of patent litigation in front of Judge

18   Thrash that's now going to have to be repeated.  There are

19   substantial efficiencies by having Judge Thrash oversee these

20   cases.  He is familiar with the issues.  And don't -- that's

21   not just me.  That is part of the rationale of Judge Pfaelzer's

22   decision when she sent the FTC's case here."

23          Now Mr. Ryan and Defendants are saying, Put on the

24   blinders, don't look at the patent, it's a sham standard.

25          So to summarize, instead of reading the 11th Circuit

1    court's precedent as Defendants argue, Your Honor should look

2    at the plain language of those precedents, read them consistent

3    with Supreme Court law, apply them as the Southern District of

4    Florida did on remand in a similar type of case and as the

5    Defendants themselves argued when they tried to get this case

6    and successfully got this case transferred to this court.

7    Under this reading of the 11th Circuit precedent, the FTC's

8    complaint clearly states a claim as set in paragraphs 86

9    through 92.

10          Now, again, I'm not sure how I'm doing on time.  What

11   kind of patent inquiry, it might be interesting to talk a

12   little bit about what kind of patent inquiry would the 11th

13   Circuit precedence require Your Honor to undertake.  And,

14   again, I'd refer to the Terazosin court's decision.  That's the

15   Southern District of Florida on remand from the 11th Circuit in

16   Valley Drug.  It was faced with the very same question.  And

17   here's what the 11th Circuit instructed the court to do in

18   Valley Drug on the remand.  It's a bit of a long quote, but I

19   think it's worth reading the whole thing.  This is on page

20   1312:

21          "The appropriate analysis on remand will likely

22   require an identification of the protection afforded by the

23   patents and the relevant law in consideration of the extent to

24   which the agreements reflect a reasonable implementation of

25   these.  Appellants, for example, contend that certain

1    provisions of the Geneva Agreements are analogous to a

2    consensual preliminary injunction and a stay of judgment

3    pending appeal.  To evaluate this claim, the provisions of this

4    agreement should be compared to the protections afforded by a

5    preliminary injunction and stay mechanisms and considered in

6    light of the likelihood of an Abbott obtaining such

7    protections" -- Abbott was the brand company -- "what was the

8    likelihood that Abbott could have gotten an injunction,

9    preliminary injunction, what was the likelihood that Abbott

10   could have kept the generics out, and compare that to what they

11   did under the agreement.  But that requires taking a look at

12   the patent."

13          And on remand the District Court did just that.  It

14   considered the likelihood of the patentees' success as seen at

15   the time, not trying to do a full-blown patent trial at the end

16   but as seen at the time of the agreement what was the

17   likelihood of the patentees' success.  And the Florida District

18   Court undertook its analysis without conducting a full-blown

19   patent trial.  Instead, it did it on a summary judgment record;

20   and the record included briefs with citations to the patent

21   record and a couple of expert reports.

22          So what would this mean for this court if you deny

23   the motion to dismiss as we respectfully request?

24          It mostly would mean briefing and argument on papers,

25   including exhibits from the patent record at the time.  It

1    might also mean limited testimony from experts.  But it would

2    not necessarily mean engaging in a full-blown, after-the-fact

3    patent trial.

4         Now, I'm anticipating what one of the arguments that

5    Defendants will make as they come back up here in rebuttal.

6    And I'm certain -- I'm confident that they will tell you the

7    Terazosin case shouldn't really be paid that much attention to,

8    the Florida case where the judge faced the same situation you

9    do because it involved what's known as an interim settlement as

10   opposed to a final settlement.  What that means, there the

11   parties' agreements didn't resolve the entire litigation.  It

12   really was more of a generic agreeing not to enter during the

13   pendency of the litigation.  It was like a preliminary

14   injunction perhaps pending the outcome of the court decision.

15        But I believe if you hear that argument, Your Honor,

16   it's not persuasive if you look carefully at the 11th Circuit

17   decisions because, first of all, in Valley Drug itself the

18   District Court was analyzing two agreements.  As here there was

19   a branded company Abbott, there was a generic company Geneva

20   and another generic company called Zenith.  And Abbott entered

21   an agreement with Geneva, and Abbott entered an agreement with

22   Zenith.  The Abbott agreement with Geneva was interim.  The

23   Abbott agreement with Zenith was a final settlement.  They were

24   both in play.

25        And, truthfully, the 11th Circuit applied the same

1    standard to both the interim settlement and the final

2    settlement.  And it talks throughout the decision about the

3    agreements, not about the interim agreement and not about the

4    final agreement, but it talks about the agreements.  And when

5    the 11th Circuit provided the District Court with the

6    instructions on remand, it again referred to both the final and

7    interim settlement agreements in the plural:  "The appropriate

8    analysis on remand will likely require an identification of the

9    protection afforded by the patents and the relevant law in

10   consideration of the extent to which the agreements reflect a

11   reasonable implementation of these."

12            That's at 1312.

13            And the court -- the 11th Circuit applied the same

14   legal standard in that third case which we haven't talked that

15   much about, the Andrx v. Elan case, even though the agreement

16   in that case was a final settlement.  So I don't think this

17   distinction between interim settlements and final settlements

18   holds water in the context of his motion to dismiss and what

19   we're talking about here today.

20            Let me take a look back.  I am getting pretty close

21   to the end.  Let me just real quickly turn to Noerr, Par's

22   Noerr argument.  And what Par is saying in that case is that

23   its private agreements with Solvay not to compete are entitled

24   antitrust immunity because of the action of Your Honor in

25   entering the consent judgment.  What they're saying is, Your

1   Honor, when you entered this six-page consent judgment which

2   Mr. Gidley said they subjected themselves to the consent

3   judgment, but I think they proposed it to you, you basically

4   blessed everything that's in their agreements in which they

5   settled.

6          Now, this was signed on September the 15th by Your

7   Honor.  These agreements were entered on September 13th, a

8   couple days before.  And I doubt -- there's absolutely no

9   evidence that I found in the record that they ever presented

10  these agreements to you so you could see what was really going

11  on here.  According to Par, this is the source of the restraint

12  on competition, not this.

13         Okay.  Since I'm past my time, Your Honor, I am going

14  to go ahead and sit down unless you have any other questions.

15         THE COURT:  All right, Mr. Meier.

16         All right.  Well, let's take a ten-minute break.

17  Court's in recess for ten minutes.

18         (A short recess was taken.)

19         MR. GERSTEIN:  Good afternoon, Your Honor.

20         THE COURT:  Yes, sir.

21         MR. GERSTEIN:  I'm Bruce Gerstein, Garwin, Gerstein &

22  Fisher from New York.  I am speaking on behalf of the direct

23  purchaser Plaintiffs.  I represent the Louisiana Wholesale Drug

24  Company.

25         THE COURT:  All right.  Mr. Gerstein, the Plaintiffs

1    have 25 minutes of your time left.

2              MR. GERSTEIN:  Okay, Your Honor.

3              Judge, during the course of the FTC's argument, you

4    asked the question which I think is a very, very important

5    question; and that is you referred, I think, to the indirect

6    purchaser's complaint and you asked what was that about, the

7    NCE exclusivity and the February 3rd, 2003, date.  And it's not

8    only part of their case, but it's part of all the cases.  And I

9    think it's important to understand that what that's about is

10   Hatch-Waxman.

11             THE COURT:  Well, don't waste your time on that if

12   you don't think it merits it, Mr. Gerstein.  I was curious as

13   to what it meant.

14             MR. GERSTEIN:  No, I think it's critical to our

15   claim; and that's why I wanted to explain it in that context

16   because I wanted to explain what's going on here so the Court

17   could understand two statutory regimes going on at the same

18   time.  Defendants only talked about the patent which Your Honor

19   had considered in prior litigation, and they described it.  We

20   weren't party to it, but they described it.

21             But there's other factors going on, and that's

22   Hatch-Waxman.  Independently of the patent, the Hatch-Waxman

23   law provides that the branded company who files an NDA with

24   them gets a certain amount of exclusivity.  It can range from

25   three to five years.  In this case, it was a five-year

1  exclusivity that was ending in February 2003.  What that

2  exclusivity means is that the FDA will not even accept

3  applications from generics until that exclusivity period ended.

4  So you have to think about that that automatically independent

5  of the patent there is a statutory regime that's giving the

6  branded company --

7         THE COURT:  So even if you don't have a patent.

8         MR. GERSTEIN:  Even if you don't have a patent.  And

9  that's very, very important because there's other provisions we

10 referred to in our briefing and in the complaint which can

11 extend that out.  And this is the crux of our scheme claim; but

12 independently it's an element of an antitrust violation as well

13 as part of a larger scheme that you can extend it if, in fact,

14 you file a patent in what's called the Orange Book which -- and

15 these are very specific requirements that --

16        THE COURT:  Yeah, I understand that.  I got that.

17 Y'all did a good job explaining that.

18        MR. GERSTEIN:  Okay.  But if you file your patent in

19 the Orange Book and meet the standards and the standards are

20 both substantive and timewise -- and I am going to get to that

21 in a second -- you automatically can extend your exclusivity

22 for up to 30 more months.  That means that as a result of doing

23 that you have effectively extended your monopoly even if you

24 didn't have a patent.

25        THE COURT:  I thought you had to have a patent to get

1    the 30 months.

2           MR. GERSTEIN:  You have to have a patent.  You're

3    extended for 30 months if you have a patent.  I'm sorry.  I

4    misspoke.

5           But the two requirements that you have to deal with

6    is one is having filed properly and timely a patent in the

7    Orange Book, and two is bring a lawsuit within 45 days.  And,

8    specifically, if you don't do either one of those, you don't

9    get the 30 months.  That is critical to our claim because we

10   have shown and we've done in detail why the initial Orange Book

11   listing on its face was improper.

12          Critical -- and I just want to go back to this -- is

13   under the law the filing in the Orange Book with the FDA is not

14   Noerr protected.  It's not petitioning.  There's no PRE

15   standard.  It's either improper or not.  There's a standard

16   that you have.

17          Now, as to what we have shown is Defendants

18   acknowledge specifically that when they filed their patent with

19   the Orange Book it was mistaken on its face.  As to claims 1

20   through 30, they had the wrong range for sodium hydroxide.

21          And what did they do?

22          They went back to the Patent Office to try to get the

23   certificate of correction.  There's only two problems with

24   that.  One is if you don't file a patent at that point and wait

25   to get the certificate of correction which you could then argue

1    claims the patent -- the drug on its face, the approved drug on

2    its face, it doesn't apply to any previously filed ANDAs.  But

3    if you basically file at that time so that you meet the first

4    element of the requirements to get the 30-month stay, on its

5    face it doesn't meet the substantive requirements.  So they had

6    a problem.

7           And what did they do?

8           They have gone back and labeled the problem a

9    ministerial error.  And I submit to Your Honor I'm not going to

10   argue with them.  We put in our briefs why it wasn't.  But it

11   doesn't matter.  It's no different, for example, if you have a

12   Statute of Limitations and you miscounted on the clock and you

13   filed the next day.  You made an error.  There is nothing in

14   the specific statute that says errors can be forgiven.  There

15   is a requirement, and those requirements have to be met to get

16   the 30-month stay.

17          We have alleged specifically that they had a bind

18   because they knew that if, in fact, they waited to get their

19   certificate of correction the next time they could actually

20   file a lawsuit would be when the generics actually entered the

21   market.  And they say in their papers, so what.  Then we could

22   have brought a suit -- you know, we could have brought a suit

23   against them; and we would have had in their point not a sham

24   litigation.  They argue even if it's a weak litigation it

25   doesn't matter.  But it does matter all the same.

1         Why?

2         Because if you have a 30-month stay, it's automatic.

3    If you have to wait 'til specifically generics enter the

4    market, you have to go for an injunction because -- and that

5    means you have to establish to do exactly what you got from the

6    30-month stay.  You'd have to convince this Court of the

7    likelihood of success and irreparable harm to actually get the

8    stay.  They push all that aside for the antitrust.

9         What we have alleged principally in our case as part

10   of the scheme is that before they got to the agreements context

11   they went out and manipulated the Hatch-Waxman statutory scheme

12   to get their 30 months additional which harmed the consumers

13   and competition.  And that is generally the crux of our case.

14        I've heard Noerr-Pennington, Noerr-Pennington,

15   Noerr-Pennington.  That applies specifically only as to sham

16   lawsuits.  It doesn't apply to the Orange Book listing and

17   whether or not the Orange Book listing is improper.  And we

18   have made allegations specifically as to why it wasn't, and

19   much of it is conceded.

20        There's a reason you haven't heard anything about the

21   Orange Book listing in their opening.  They don't want to

22   address it.  They want to conflate this only as to the sham.

23   But if you are looking at an antitrust violation, did they do

24   something that manipulates the government process, in a way

25   they're giving them the ability to exclude competition where

1    they otherwise couldn't.  Now, that is the beginning; but it

2    just shows the context of where they were in the agreement.

3    And as far as we know, none of that was before the Court.

4            So that is if you are looking generally in the

5    allegations, that is the crux of our scheme claim.  The fact of

6    the matter is the generics have argued, well, they haven't

7    alleged the Orange Book listing or sham litigation or anything

8    improper up to that point against us.  We are not bringing a

9    specific claim against them for those independent acts.  We are

10   bringing a claim because the generics by entering into

11   agreements joined the scheme by agreeing at that point to allow

12   Solvay to extend out its monopoly.  And that's what we have

13   alleged specifically in the complaint.

14           So if you look at the overall facts, they are sitting

15   there saying, Judge, it was a mistake, forgive us.  But that's

16   not what is allowed under Hatch-Waxman.  They had a problem,

17   and the problem was we couldn't properly file the Orange Book

18   on the day that we filed it.  And if we waited, it would not be

19   applicable to the ANDAs filing by the generics that were filed

20   prior to the date that they got a certificate of correction.

21   They're in a box.  And what they do which is exactly what's

22   wrong under the antitrust laws, they want to self-help.  They

23   didn't want to use the rest of the regime that was available to

24   them under the patent law, wait for the generics to come to

25   markets, go out and seek an injunction to try to exclude them

1      because that would be a very different position.

2              That is the crux of our Orange Book listing, and I

3      refer the Court to our briefs because we have tried to cover as

4      much detail as we can what was the substantive and procedural

5      basis.

6              I'd like to turn again because I think it's as

7      important to the 11th Circuit cases.  I know the Court has

8      raised issues about it.  The only thing I'd like to suggest to

9      the Court is that -- and I know that this is repeating what

10     Mr. Meier said in general, but I'd like to go a little bit more

11     specific -- is that there's been a lot of things said about

12     what the case law says.  But it's very, very important to read

13     it and read it clearly.  If the Court would indulge me, I have

14     made copies of Schering-Plough because I want to just

15     specifically refer to certain language and I have yellowed it.

16     And I have copies for everybody.

17             THE COURT:  That's fine.  I have got a copy up here.

18             MR. GERSTEIN:  I appreciate that.  It's easier for me

19     because of the short time.

20             Judge, first of all, everything is in context.  So

21     I'd like to say it from my perspective having read it, as a

22     matter of fact, having really studied it in the last number of

23     weeks again because I have argued this on a number of

24     occasions, but I'd like to start with Schering and then go back

25     to Valley Drug.  If you look at Schering in context, it's very

1    important to understand what has not been said that this was

2    after a trial.  This was not at the motion-to-dismiss stage.

3    It was not a motion-for-summary-judgment stage.  It was after

4    the administrative law judge actually tried the case.  And if

5    you read that in context, I believe you'll see that what

6    Mr. Meier is suggesting is absolutely clear as a bell from the

7    decisions.

8           For example, the court where I have on page 7 in the

9    yellow, it notices specifically that the ALJ which specifically

10   evaluated the strength of the patent, that was a finding.  If

11   you turn to page 9 in the quoted passage, it specifically shows

12   when he made his findings that he determined what they call the

13   exclusionary power of the patent after considering the evidence

14   by the Defendants versus the clear lack of evidence put in by

15   the Federal Trade Commission.  Matter of fact, they criticize

16   the Federal Trade Commission because what they said was they

17   cavalierly dismissed their requirement to do it.  But look

18   where I underlined it.  It said without any evidence to the

19   contrary there is a presumption that the '743 patent is valid.

20          I also would like to refer to the Court because I

21   think it's very important, you made a statement in your

22   comments to -- I believe to Mr. Meier earlier about whether he

23   is suggesting that the 11th Circuit was suggesting or opining

24   that it was a lower standard than a sham standard in connection

25   with reverse payment cases.  And if you look at page 8, the

 1    Court is quoting from Judge Posner who was sitting at that time

 2    as a District Court judge by designation in the Sahi case.  And

 3    look at the language.  It's almost the identical language that

 4    you had suggested would be a lesser standard.

 5              It says:  Suppose a seller obtains a patent that it

 6    knows is almost certainly invalid that is almost certain not to

 7    survive the judicial challenge.  As soon as its competitors

 8    have settled the suit by licensing them to use its patent in

 9    exchange for the agreement not to sell the patented product for

10    less than the price specified in the license, in such a case

11    the patent is sued and the settlement would be devices for

12    fixing prices in violation of the antitrust law.

13              That's not a sham standard.  As soon as it says

14    almost certainly, that's not a sham standard.  It's something

15    less.  It's evaluating exactly what Your Honor was positing.

16    And they were just using this as an illustrative statement.

17    But if you think about what we're arguing we're fighting over

18    what does it mean when it says exclusionary power of the

19    patent?  Does it just mean the nominal term as they are

20    suggesting that a patent holder has the absolute right to

21    exclude up to the point of determining invalidity?  Or is the

22    Court actually saying you have to give credence to the validity

23    of the patent holder or what the evidence is and weigh that?

24    You have to give credence to what the Court is really saying I

25    believe, and it emphasizes exactly?

1          What's really going on here?  Is this really a

2    settlement of patent litigation, or is this something else?

3          Now, the other points I was making 'cause this is

4    after trial and I know that the FTC disagrees with this -- I

5    have a private case, and I disagree with this -- but the

6    administrative law judge also specifically found on the

7    evidence that the moneys that were alleged to be the reverse

8    payment to pay off the generic not to come from market had

9    nothing to do with that.  It had to do with separate license

10   fees which were fair.  That was the finding of the Court.  That

11   was binding.  That was what was reviewed.

12         So they're actually finding in this case that you

13   have a settlement where you have payments separate and apart to

14   pay for licenses and a settlement of the patent suit for a

15   lesser term.  Nobody argues specifically if you just are

16   negotiating on the term that that wouldn't be -- that would

17   create antitrust problems.  It's when it happens where the

18   alleged wronged party is being paid by the alleged wrongdoer,

19   and that's where the problem comes in.

20         THE COURT:  So you're saying then that if the

21   Defendants in this case had simply entered into an agreement

22   that the generics could have a license to sell generic AndroGel

23   in 2015, no money changed hands --

24         MR. GERSTEIN:  I said if they only settled for the

25   term, yes, nothing else.  But if, in fact, the license is a

1    reverse payment, those are always issues that you have.  But

2    if, in fact, they just negotiated simplest case, we will agree

3    not to come on until sometime less and nothing else more that

4    the branded did not pay off the generic any other way, that is

5    a means of settling patent suits all the time.  That's what

6    they do.  And from what I understand, they do not come under

7    antitrust --

8         THE COURT:  So you are saying it's the payments that

9    made --

10        MR. GERSTEIN:  It's the payments that make

11   everything.  And if you think of the logic, it's what they call

12   reverse payments because the reverse payments are being made by

13   the alleged wrongdoer.

14        Now, I am going to go far afield for one second

15   because Defendants always said, well, that's because it's

16   created by the asymmetrical negotiating power.  That's what

17   they said in their briefs.  The fact of the matter is it's the

18   branded company that creates an asymmetrical negotiating power.

19        If you go back to my explanation at the beginning of

20   the 30-month stay in the Orange Book listing, if the branded

21   does not want to get that asymmetrical negotiating power that

22   the suit is brought before the generic has to come to market at

23   risk, all it has to do is not file a lawsuit within 45 days.

24   It knows that.  It's getting the benefit of the 30-month stay

25   if it has a legitimate basis in exchange for what Congress had

1   specifically provided for was the statutory scheme.  But nobody

2   has ever suggested that you could just unilaterally then extend

3   the time beyond it.

4          The rebates set out clear allegations on the sham,

5   but in this case that's the one thing I want to go back to is

6   you have to look at it in the context.  None of the other cases

7   that you are going to see, not Schering-Plough, not Valley

8   Drug, not any of the other cases has specifically dealt with

9   the allegation that the Orange Book listing was improper

10  because that in itself is an independent ground.  If the Orange

11  Book listing is improper, there's no Noerr-Pennington

12  protection.

13         It's not petitioning, and that's because the FDA does

14  not have discretion.  It must accept the branded's word that

15  the patent claims the drug.  It has -- it can't do anything.

16  It's been ruled on numerous cases, recently in ADT in the 2nd

17  Circuit that there is no immunity.  So PRE doesn't apply to

18  that at all.  The only reason it implicates, you know, the

19  patent litigation is because there are two requirements, the

20  proper Orange Book listing and litigation within 45 days.  You

21  can have litigation of 45 days and no Orange Book listing.

22  Nobody says that the Orange Book listing that the litigation

23  must be a sham or not a sham.  All it says is you have to file

24  a litigation in 45 days, if you file.

25         If you look back at the Hytrin case, In Re Terazosin

1    case that Mr. Meier referred to, one of the interesting points

2    is as to one of these companies they made a mistake.  They had

3    an Orange Book listing, but they filed their litigation beyond

4    the 45 days.  I think they went to 46 or 47 days.  I don't

5    specifically remember.  But they missed the date.  Just like

6    here they had a problem on the Orange Book listing.  They

7    couldn't get the 30-month stay on that, and that was a serious

8    problem.  I mean, that is the law.  You just can't fudge it or

9    relax it or do anything else.

10          So it's very important to look at from our

11   perspective one has that this is an overall scheme but in

12   context of what was going on.  Here they had already kept the

13   generics off the market for the period of time under the

14   30-month stay, and it's only at that point where the generics

15   have come on the market and extended they said -- they went

16   back to them and said, Hey, we can share in the non-profits.

17   You can all do better.

18          And the other point that's there is if, in fact,

19   there's no Orange Book listing, there's no paragraph for

20   certifications, there's no 180 days' exclusivity, the generics

21   would be free to come to market.  We have alleged in the

22   complaint which is FDA regulations if there's no paragraph --

23   if there's no Orange Book listing and there is different

24   certifications, the FDA under its regulations typically

25   approves those applications much quicker.  They say within six

1    months that's their obligation unless the parties agree to

2    extend it.  So all these factors were put on hold because our

3    view is without what they did in the larger overall scheme the

4    product would have been on the market much earlier.

5            That's not to take away, Your Honor, from both

6    together and separate reverse payment cases because if you look

7    at them that's a wrong but if you combine the wrong in context

8    -- and my point is that under Schering-Plough they said look to

9    everything.  The administrative law judge did.  He made these

10   holdings after, one, considering the validity, the evidence on

11   both sides --

12           THE COURT:  Now, didn't the commission reverse him on

13   that --

14           MR. GERSTEIN:  The commission reversed him, but the

15   administrative law judge said that they didn't have the right.

16   They didn't sit there, the 11th Circuit, they didn't hear the

17   credibility of the witnesses.  They didn't have a basis to

18   basically overturn the administrative law judge which was the

19   fact-finder, but that's exactly what happened.  And they

20   specifically go through that line and verse to say why it was

21   improper for the FTC to do that, to actually put in their own

22   version of the facts because he was the finder and they found

23   his evidence more compelling.

24           Now, as a Plaintiff's lawyer who's arguing in other

25   courts in this situation, do I agree with the administrative

1   law judge's conclusions?

2          No.  But that's not the point.  That was the factual

3   predicate for the 11th Circuit's ruling.  So I think it's very,

4   very important to read these cases, you know, in context.

5          The other point is which I just want to address very

6   quickly under Valley Drug and I know -- if I could just hand up

7   a copy of this very quickly.  If you look at page 9 in the

8   Valley Drug decision and the quoted language I have from there

9   which is this is the seminal decision in this circuit,

10  Schering-Plough acknowledges specifically -- and I quoted that

11  -- that Valley Drug controls.  It's telling you considerations

12  that the Court should deal with in formulating this.  And they

13  tell you that, that specifically that these are among the

14  considerations we should consider.

15         There's no hard or fast rule because what they're

16  really asking this Court to do is say what is really going on

17  here, and you'll only know that when you look at the evidence.

18  Was this really payments to keep the generics off the market --

19         THE COURT:  Excuse me, Mr. Gerstein.  Plaintiffs have

20  five minutes.

21         MR. GERSTEIN:  Okay.  I'll be very quick, Your Honor.

22         -- or is this specifically something more?  Is this a

23  legitimate settlement, or is it something in between?

24         And I highlighted that.  But I'd also like to just

25  refer you very quickly to page 12 of the decision where it

1    says, and I quote, "It may be the size of the payment to

2    refrain from repeating sometimes causing reverse payment or

3    exit payment raising suspicion the parties have faith in the

4    validity of the patent, particularly when those payments are

5    non-refundable in the event the patent prevails on the

6    infringement claim as a bond posted as part of the preliminary

7    injunction would be.  However, in the instant case, and given

8    the state of the record, it is difficult to infer from the size

9    of the payment alone that the infringement suits lack merit."

10          They are telling you something that's not merely a

11    sham.  They are looking and saying look at all the facts that

12    are going on here to basically determine whether or not what

13    these agreements were were really violations of antitrust law

14    or were they really settlements of patent litigation.

15          I just want to just briefly comment on two other

16    points.  One is, Your Honor, we have alleged in our complaint,

17    we briefed it, that there is an intergeneric conspiracy under

18    Section 1.  Defendants said it's not in our complaint.  If you

19    look at paragraph 176 of the complaint, we put in the facts and

20    we have also alleged conspiracy.  It's under the standard of

21    Masonite where a patentee basically brokers a settlement among

22    its rivals who was suing under the patent litigation, and we

23    feel that is clearly a basis for the suit.

24          And also they raise on the Orange Book listing that's

25    a throwaway argument that since the Orange Book listings were

1   more than four years ago they're beyond the Statute of

2   Limitations.  We are a direct purchaser case who is suing for

3   overcharge.  The case law is that each purchase starts the

4   Statute of Limitations.  So the fact that conduct that

5   contributed to the harm occurred earlier does not affect when

6   the statute starts.  A monopolist is not allowed to get the

7   fruits of its monopoly, and their cause of action occurs at the

8   time of purchase.

9            Thank you, Your Honor.

10           THE COURT:  All right, Mr. Gerstein.

11           Plaintiffs have three minutes.

12           MR. HOLZER:  Your Honor, Corey Holzer on behalf of

13   the end payer or indirect Plaintiffs.  We are going to rest on

14   our briefs with respect for the Court's time and believe the

15   briefs are clear.  So that's it for us.

16           THE COURT:  All right, Mr. Holzer.

17           MR. RYAN:  Thank you, Your Honor.

18           Your Honor, I'm afraid I might be guilty of being

19   unduly polite to the Federal Trade Commission because we

20   weren't going to bring up California.  They went to California

21   for the sole purpose of avoiding 11th Circuit law in this case.

22   And the suggestion that we set in California or that we set in

23   front of the Multidistrict Panel that a trial on the patent

24   merits was necessary in this case is -- how should I say it --

25   not quite right, Your Honor.

1          We moved to dismiss in California for the same

2     reasons that we're moving to dismiss here.  Now, we didn't have

3     the Schering-Plough as binding precedent in California.  At the

4     same time we told Judge Pfaelzer if they're right and there has

5     to be a trial in this case, well, then it's going to be a

6     patent trial.  And if there's going to be a patent trial, then

7     it ought to be in front of the Court that had the patent

8     litigation in front of it for three years.  That's also what we

9     told the Multidistrict Panel.

10         We have always taken the first position that this

11    case is going to be dismissed no matter where it is.  But if

12    there's going to be a trial on the merits, if we are wrong on

13    that and there's going to be a patent trial on the merits which

14    is what the FTC is seeking here -- make no mistake about it.

15    They can say it'd only take a few months, not much discovery.

16    I don't see how you can do the patent trial in this case as

17    easily as the FTC suggests.  But if there's going to be a

18    trial, it ought to be in this court.

19         Now, Your Honor, counsel for the FTC does not take

20    issue with our position that the complaint fails to allege that

21    the agreements go beyond the scope of the patent.  They don't

22    take issue with that at all.  And I think -- I think that ends

23    the case.

24         Now, with respect to our interpretation of

25    Schering-Plough, let me direct the Court to some language that

1    was used by the Federal Circuit in the Cipro case at 544 F.3d

2    1335.  Here's what the Federal Circuit said, "We agree with the

3    2nd and 11th Circuits and with the District Court that in the

4    absence of evidence of fraud before the PTO or sham litigation

5    the Court need not consider the validity of the patent in the

6    antitrust analysis of a settlement agreement involving a

7    reverse payment."

8            So that's the Federal Circuit commenting on

9    Schering-Plough, Your Honor, not us.  The Court goes on to say,

10   "The 11th Circuit did not consider or rely on evidence of

11   patent invalidity in either Valley Drug or Schering-Plough."

12           So, Your Honor, we return to where we were in our

13   opening remarks which is every court that has considered the

14   issue, every court agrees with us on how to read

15   Schering-Plough and agrees with how the FTC read

16   Schering-Plough until Judge Pfaelzer transferred the case here

17   and until the Multidistrict Panel decided that the cases would

18   be heard here.  And the FTC is yet to offer an explanation of

19   how if they believe they were wrong -- they were wrong before

20   -- how they got it so wrong when, in fact, they got it right

21   before and it's today in this court where they are getting it

22   wrong.

23           Now, Your Honor, with respect to Schering-Plough

24   itself, let me just read.  We heard some comments about the

25   size and the fact of the payment and the suggestion that if

1    there's no payment then there's no problem.  This is from

2    Schering-Plough:  "We have said before and we say it again that

3    the size of the payment or the mere presence of a payment

4    should not dictate the availability of a settlement remedy.

5    What we must focus on is the extent to which the exclusionary

6    effects of the agreement fall within the scope of the patent's

7    protection."

8            That's the issue.  It's not whether there was a

9    payment.  It's not how big the payment was.  The issue

10   identified by Schering-Plough is do the agreements extend the

11   scope of that patent, the potential exclusionary effects of the

12   patent.  Schering-Plough cannot be read any other way than to

13   say unless there's fraud or unless there's sham litigation you

14   can't come back and attack a settlement and get a full trial on

15   the merits because otherwise these patent cases would never

16   settle.

17           Again, reading from the decision of the 11th Circuit:

18   Finally, the caustic environment of patent litigation may

19   actually decrease product innovation by amplifying the period

20   of uncertainty around the drug manufacturer's ability to

21   research, develop and market the patented product or allegedly

22   infringing product.  The intensified guesswork involved with

23   lengthy litigation cuts against the benefits proposed by a rule

24   that forecloses a patentee's ability to settle its infringement

25   claims.

1          Your Honor, the Court is quite clear there is a

2    tremendous social cost that would be realized if these kinds of

3    claims cannot be settled.  And, again, we'll say it again.  We

4    don't think there's any other way to read Schering-Plough.

5          Now, with respect to the references to the Supreme

6    Court case law, and we do address this in the brief, all of

7    those Supreme Court cases predated Schering-Plough.  The FTC

8    argued those very Supreme Court cases to the 11th Circuit.

9    They lost.  They shouldn't be in here suggesting that the 11th

10   Circuit misapplied or misunderstood or didn't get Supreme Court

11   precedent right.  The 11th Circuit didn't agree with the FTC.

12   They had the arguments in front of them, and they didn't agree

13   with the FTC.

14         Finally, Your Honor, I think that I would cite the

15   Court to one case which was a motion to dismiss on Schering

16   grounds that was granted.  Now, it was granted in the Eastern

17   District of New York.  But that case can be found at

18   277 F.Supp. 2nd 121.  In other words, yes, there was an

19   administrative trial in the Schering-Plough case itself.  But

20   from that administrative trial and from the decision in

21   Schering-Plough we now have a rule of law.

22         There's absolutely no reason that that rule of law

23   can't be applied on a motion to dismiss, and we're not aware of

24   any court that has held that it cannot be.  It simply hasn't

25   come up as far as we can tell except in this particular

1    decision, Eastern District of New York.  It's perfectly

2    appropriate.  It's no different an exercise than this Court

3    engages in all the time.  What are the required elements of

4    pleading the Plaintiffs' cause of action?

5           If something's missing, if a required element is

6    missing, then the complaint is subject to dismissal.  And the

7    required element that's missing here is any allegation that the

8    settlement agreements go outside the exclusionary potential or

9    the scope of the patent.

10          Thank you very much, Your Honor.  I appreciate your

11   time.

12          THE COURT:  Thank you, Mr. Ryan.

13          Mr. Sunshine, you've got five minutes.

14          MR. SUNSHINE:  Thank you, Your Honor.  I promise not

15   to use all of that entire length of time in making just a few

16   points.  I want to focus on three quick points.  None of them

17   will take very long.

18          First, the direct purchaser Plaintiffs have said that

19   they have alleged in paragraph 176 there's allegations of a

20   conspiracy between Watson and Par Paddock.  I have read 176

21   more times than I can count.  I find that nowhere in paragraph

22   176.  It's a rather long paragraph.  I won't read it to it,

23   Your Honor.

24          But the sentence that I think that comes closest to

25   arguably supporting that point would be the first sentence of

1   paragraph 176 which says on information and belief Solvay would

2   not have settled with one but not both the generic Defendants.

3   And, of course, Your Honor can go on and read the rest of that

4   paragraph.  I don't see anything else in there that covers it.

5          That paragraph speaks just to Solvay's state of mind.

6   It has nothing to do with an agreement between Watson and Par

7   and Paddock.  And, of course, even if there were to be some

8   germ of argument in here about parallel conduct and the two

9   generics consciously being aware of these agreements going

10  simultaneously, that's precisely the type of lack of direct

11  interaction between the two supposed co-conspirators that

12  Twombly and the cases before say, you know, it doesn't cross

13  that threshold.  So I think you can dispose of the intergeneric

14  conspiracy argument pretty quickly.

15         Secondly, direct purchasers also made a big point

16  about the Orange Book listing.  Direct purchasers said that the

17  Orange Book listing is not covered by Noerr-Pennington

18  protection.  We agree with that.  Everything else after that,

19  of course, we do not agree with.

20         I think that one thing that is important to

21  understand with respect to the Orange Book is that the FDA

22  regulations require that if the branded company believes that

23  the patent covers a listed product or an approved use of the

24  listed product they must put that patent in the Orange Book so,

25  in other words, if the generic company -- the branded company

1    at its peril doesn't list a product that they think is covered.

2         And, in fact, in looking at this we have cited a case

3    in our papers, Your Honor.  It is -- pardon me for one second.

4    It's the Twin City Bakery Workers versus Astra where basically

5    the Court had said no Orange Book listing in essence unless the

6    patent was not listed in good faith, it was a sham listing the

7    patent.  So it's sort of the same standard coming back all over

8    again.

9         I would also add that with respect to the Orange Book

10   listing there was one mistake in it, one mistake in the patent

11   according to the direct purchaser allegation.  The patent had

12   many, many claims.  Those other claims were still valid claims

13   and need to be listed.  For the Plaintiffs' argument to be

14   ripe, every one of the claims of the patent would have had to

15   have satisfied this Twin City Bakery sham as in effect sham

16   standard.  Of course, they clearly cannot do that.

17        And, lastly, on the overall scheme argument, you

18   know, it seems to me that Your Honor hit it right on the head

19   when you said AndroGel and the generics are bioequivalent.

20   This isn't a case about whether there's some real difference

21   between the generics and between the AndroGel product.  This is

22   really a case -- and crediting the complaint for at least what

23   it's trying to say, this really is a question of did Solvay

24   botch its prosecution of the patent.  It thought it was trying

25   to get a patent on the product AndroGel.  It named AndroGel in

1    the patent 227 times.

2           There was a dispute about whether that patent covered

3    or whether it didn't cover.  We argue that's the underlying

4    dispute.  But now you can't turn an overall scheme argument

5    into really what's one act.  It's almost like saying, well,

6    Your Honor, we recognize that it's a baseless litigation claim

7    with respect to the filing of patent prosecution, but don't

8    worry about that piece because it's no overarching scheme.

9    It's almost like saying, well, this is Solvay's scheme.  They

10   thought about getting a patent.  They researched getting a

11   patent.  They put a team together.  They filed.  They

12   prosecuted the patent.  They got the patent.  They filed it in

13   the Orange Book, and then they bought a listing.

14          Well, it's really all one single act.  It's really

15   all covered by whether the patent is a legitimate and valid

16   patent or not which clearly there was a dispute over.  And

17   there is case law that we cite in our papers, Abbott Labs

18   versus Teva, where the Court had said if an element of a

19   Plaintiff's overall scheme is entitled to Noerr-Pennington

20   protection then it cannot be considered as part of an overall

21   scheme.  You can't take something that's immune and say, well,

22   okay, we recognize on its own it doesn't violate the antitrust

23   laws.  But somehow if I throw it into a broth, it then takes on

24   some other significance.

25          With that, Your Honor, unless you have more

1   questions, I'm done in hopefully less than five minutes.

2           THE COURT:  Four minutes, Mr. Sunshine.  So,

3   Mr. Gidley, you've got one minute.

4           MR. GIDLEY:  Thank you, Your Honor.  Very briefly.

5           On the Orange Book, obviously there's no liability.

6   We didn't do anything on the Orange Book listing, so there's no

7   liability for Par or Paddock.  As to the argument that the side

8   agreements were not submitted to Your Honor, Valley Drug

9   answers that at 1309:  The failure to produce the competing

10  generic drug rather than the payment of money is the

11  exclusionary effect.

12          That's Valley Drug at 1309.

13          The second point, Your Honor, is once valid

14  governmental action has occurred there's no peeking behind the

15  curtain.  Just as we don't look at whether Congress was meeting

16  at 1:00 a.m. or whether they had five years of hearings,

17  MedImmune stands for the proposition that we do not put any

18  kind of piercing of what the decisionmaker did.

19          Third, Your Honor, unlike the Cipro consent judgment

20  which is sort of a blank check for a side agreement, our

21  consent judgment lists the various conditions for entry.  And

22  that was done publicly; and anyone that was disgruntled, $60

23  billion, $80 billion companies in this courtroom suing us today

24  for treble damages, they could have come before Your Honor in

25  September or October of 2006 and moved Your Honor to modify

85

1    that judgment.  They never have.

2            Your Honor, with that I suggest that it's Par

3    Paddock -- and, again, we also didn't hear anything about

4    second filer --

5            THE COURT:  Time's up, Mr. Gidley.

6            MR. GIDLEY:  Thank you, Your Honor.

7            THE COURT:  Well, thank you very much.  We will take

8    a very careful look obviously at the issues and get out a

9    written order as soon as we can.  I hope all of you get back to

10   wherever you are going safely.

11           Court's in recess until further order.

12           (Proceedings adjourned at 4:16 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

86

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6         I hereby certify that the foregoing pages, 1 through

7    85, are a true and correct copy of the proceedings in the case

8    aforesaid.

9         This the 13th day of January, 2010.

10

11

12

13    _____

14    Susan C. Baker, RMR, CRR
      Official Court Reporter
15    United States District Court

16

17

18

19

20

21

22

23

24

25