# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **IN RE ANDROGEL ANTITRUST LITIGATION (II)** | **CASE NO. 1:09-MD-2084-TWT**<br><br>**DIRECT PURCHASER CLASS ACTIONS**<br><br>**DIRECT PURCHASER INDIVIDUAL ACTIONS** |
| **ROCHESTER DRUG CO-OPERATIVE, INC., ET AL.,**<br>    **Plaintiffs,**<br>v.<br>**UNIMED PHARMACEUTICALS,  INC., ET AL.**<br>    **Defendants.** | **CASE NO. 1:09-CV-956-TWT** |
| **LOUISIANA WHOLESALE DRUG CO., INC., ET AL.,**<br>    **Plaintiff,**<br>v.<br>**UNIMED PHARMACEUTICALS,  INC., ET AL.,**<br>    **Defendants.** | **CASE NO. 1:09-CV-957-TWT** |
| **MEIJER, INC., ET AL.,**<br>    **Plaintiffs,**<br>v.<br>**UNIMED PHARMACEUTICALS, INC., ET AL.**<br>    **Defendants.** | **CASE NO. 1:09-CV-958-TWT** |

| | |
|---|---|
| **STEPHEN L. LAFRANCE PHARMACY, INC. ET AL.**<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**UNIMED PHARMACEUTICALS, INC., ET AL.**<br><br>        **Defendants.** | **CASE NO. 1:09-CV-2913-TWT** |
| **RITE AID CORPORATION, ET AL.,**<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**UNIMED PHARMACEUTICALS, INC., ET AL.**<br><br>        **Defendants.** | **CASE NO. 1:09-CV-2776-TWT** |
| **WALGREEN CO., ET AL.,**<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**UNIMED PHARMACEUTICALS, LLC, ET AL.**<br><br>        **Defendants.** | **CASE NO. 1:09-CV-3019-TWT** |
| **SUPERVALU, INC.,**<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**UNIMED PHARMACEUTICALS, LLC, ET AL.**<br><br>        **Defendants.** | **CASE NO. 1:10-CV-1024-TWT** |

## MEMORANDUM IN SUPPORT OF SOLVAY'S MOTION TO (1) PRECLUDE PLAINTIFFS' RETENTION OF SOLVAY'S FORMER CONSULTANT AND (2) DISQUALIFY PLAINTIFFS' COUNSEL EXPOSED TO SOLVAY'S PRIVILEGED INFORMATION THROUGH THIS CONSULTANT

## I.    INTRODUCTION

Solvay recently learned that Plaintiffs retained a scientist, Dr. Howard Maibach, who served as non-testifying consultant to Solvay in the '894 patent litigation on the same issues that are in dispute here.  The accompanying declaration from Solvay's lead patent counsel, James Ferguson, attests to his retention of Dr. Maibach in the '894 litigation and to the unsurprising fact that he shared his mental impressions, thought processes, opinions, and legal analyses with this non-testifying consultant at that time.  Plaintiffs have confirmed that they retained Dr. Maibach more than five months ago, that he has spent more than 19 hours working for them, that at least four attorneys at two of Plaintiffs' law firms have spoken with Dr. Maibach, and that Dr. Maibach has had "confidential" communications with Plaintiffs' counsel.  The current retention has thus given Plaintiffs' counsel access to, and the ability to use against Solvay, the work product of Solvay's own patent litigation counsel.

This is particularly troubling because Plaintiffs' claim here is that the '894 patent litigation was a sham, *i.e.*, that Solvay's positions in the litigation in

which Dr. Maibach was originally retained were subjectively and objectively baseless. Thus, Solvay's own *subjective* views of the patent litigation are directly at issue, making Plaintiffs' access to Solvay's counsel's work product even more prejudicial than it might be in another type of litigation. Plaintiffs can access, through Dr. Maibach, the otherwise confidential and privileged legal analyses and mental impressions of Solvay's lead patent counsel, even as Plaintiffs' theory of the case turns on what Solvay thought of its chances of success in the patent case.

Nor is this an isolated retention of an adversary's former consultant. As explained in the contemporaneous motion of Par/Paddock, Plaintiffs also retained one of Par/Paddock's former non-testifying consultants, Dr. Michniak. Although Solvay has asked Plaintiffs to disclose any other experts they have hired or are considering hiring to avoid any more such conflicts, Plaintiffs have so far refused. Indeed, it appears that Plaintiffs' counsel retained Dr. Michniak *knowing* that she had served as a consultant to Par/Paddock.

Solvay has sought for the past month to resolve this issue with Plaintiffs' counsel though the meet-and-confer process. Solvay described the nature of Mr. Ferguson's communications, and the fact that he shared his mental impressions and work product, with Dr. Maibach. Par/Paddock went so far as to give Plaintiffs a draft declaration from its patent counsel explaining that he shared

confidential information with Dr. Michniak.  Plaintiffs have refused to budge.
Instead, Plaintiffs insist they can continue to use Dr. Maibach (and Dr. Michniak),
and will only consider withdrawing these experts as part of a trade in which
Defendants agree not to seek disqualification of any Plaintiffs' counsel.[1]

Solvay thus brings this motion to seek, first and foremost, the
disqualification of Dr. Maibach.  An expert, particularly a non-testifying
consultant, entrusted with sensitive, privileged information about Solvay's
strategies and work product, cannot be permitted to switch sides and utilize that
information against Solvay.  The prejudice to Plaintiffs from such a
disqualification would be quite limited, given their ability to hire another expert.

Second, the Court should disqualify any Plaintiffs' counsel who might
have obtained Solvay's patent counsel's work product from Dr. Maibach.  This is
admittedly a very serious request, but there is no other way to protect Solvay's
work product.  There is no way to unring the bell here, and there is no practical
way to figure out what work-product information Dr. Maibach has transmitted.
Plaintiffs do not know what work product Solvay's counsel shared with Dr.

---

[1] Barely an hour before this filing, Plaintiffs suddenly indicated a willingness to
discuss these issues after four weeks without progress.  Given the importance of
the issues and the time that has elapsed, Defendants are filing this motion, but will
make every effort to resolve these issues before the hearing.

Maibach in the first instance, and Solvay should not be forced to reveal its privileged information or attorney work product in order to protect it.  Nor is Dr. Maibach in a position to judge what work product was shared with him or how conversations with Solvay's patent counsel influenced his thinking.  Even if Plaintiffs claim that their retention of Dr. Maibach was innocent (a claim they cannot make for Dr. Michniak), that would not change the fact that Solvay's privileges can be protected only through disqualification.

Plaintiffs admit that two firms have worked directly with Dr. Maibach, but Plaintiffs have refused to describe their communications with Dr. Maibach.  They have not, however, denied that these two firms had substantive discussions with Dr. Maibach.  Given the substantial amount of time Dr. Maibach has been working with these counsel, Solvay seeks disqualification of these two firms.  Again, the prejudice to Plaintiffs should be limited because they are represented by numerous other firms.

Third, Solvay respectfully seeks an order requiring each of the other Plaintiffs' law firms to describe the extent to which it has learned any information from Dr. Maibach.  If any other Plaintiffs' law firm has received substantive information or insights from Dr. Maibach, whether directly or indirectly, it should also be disqualified.

## II.     FACTUAL BACKGROUND

### A.     <u>Solvay's Retention of Dr. Maibach in the Underlying Case</u>

In October 2003, James R. Ferguson, lead counsel for Solvay and Unimed in the underlying patent cases, retained Dr. Maibach, a dermatologist at the University of California, San Francisco, as a non-testifying consulting expert in the underlying lawsuits.  Ferguson Decl. ¶ 5 & Ex. A, at 1.  Dr. Maibach was retained by Solvay's patent counsel "to enhance [their] understanding the role of each of the ingredients in AndroGel's formulation played" in its operation. Ferguson Decl. ¶ 8.  Dr. Maibach's engagement lasted for about four months; he submitted bills for about $4000, reflecting approximately 10 hours of work.  *Id.* ¶¶ 9-10.

*Retention Agreement & Confidentiality Provisions.*  As described in the declaration submitted by Mr. Ferguson, Solvay's counsel entered into a written retention agreement with Dr. Maibach, which explained that his "work, opinions, conclusions, and communications will reflect the Unimed and Solvay attorneys' litigation strategies, thought processes and client communications" and therefore "would be governed by the attorney-client privilege and attorney work product rule."  Ferguson Decl. ¶ 6 & Ex. A, at 1.  Dr. Maibach agreed "to do all things necessary to preserve those privileges," and he also agreed that "any non-public

documents and information" that he acquired from Solvay, Unimed, or their counsel in connection with the lawsuit, as well as "any conclusions or judgments that [he] reach[ed]," "will be maintained in strict confidence and will not be disclosed to any other person." *Id.* The agreement expressly explained that the confidentiality restrictions "will continue even after the termination of [his] consulting work" for Solvay and Unimed and "after termination of the matter." Ferguson Decl. Ex. A, at 1-2.

### Mr. Ferguson's Disclosure of Confidential and Protected

*Information to Dr. Maibach.* As Mr. Ferguson explains,[2] he spoke with Dr. Maibach at length on multiple occasions regarding the substance of the case. Mr. Ferguson shared his mental impressions, legal analysis, and litigation strategy with Dr. Maibach based expressly on the expectation that this information would remain confidential. Ferguson Decl. ¶¶ 7, 9.

Mr. Ferguson discussed with Dr. Maibach several of the contested issues in the litigation — all of which have been raised by Plaintiffs in this case as well — including challenges to the validity of the '894 patent and issues regarding the role played by each of the ingredients of the AndroGel formulation in

---

[2] Should the Court require, Solvay's patent counsel is prepared to submit *in camera* even more detailed descriptions of the work product shared with Dr. Maibach.

achieving AndroGel's unique pharmacokinetic profile described in the '894 patent. *Id.* ¶¶ 8-9.  Dr. Maibach's assistance was critical to the development of Solvay's legal positions on several of the most important issues in the patent case, *id.*, which are, not surprisingly, some of the most important issues in this case.  During discussions with Dr. Maibach, Solvay's counsel Mr. Ferguson revealed his analysis of legal and factual issues and themes, as well as other specific elements of the litigation strategy, *id.* ¶ 8, and these analyses and themes reflected his opinions and mental impressions.  Solvay's counsel also selected documents for Dr. Maibach to review in connection with his consulting on the litigation.  *Id.* ¶ 10.  Although these documents themselves were publicly available, counsel's selection of documents that they regarded as important for Dr. Maibach to consider reflected attorney work product.  Dr. Maibach also participated in a discussion about the case with a Solvay employee.  *Id.*  The substance of this conversation is protected by the attorney-client privilege.

### B.   Plaintiffs' Retention of Dr. Maibach in This Case

On February 25, 2011, Plaintiffs' counsel sent a letter to Defendants asking if they objected to Plaintiffs' retention of Drs. Maibach and Michniak as experts.  Roberti Decl. Ex. A.  As we have since learned, this was about five months after they first spoke to Dr. Maibach, and a month after Dr. Michniak was

retained.  Roberti Decl. ¶ 8.  In the letter, Plaintiffs took the position that they did

not need Defendants' approval under the protective order, but were nonetheless

giving "Defendants an opportunity to object."  Roberti Decl. Ex. A.

Defendants promptly responded, objecting to the retentions on the

ground that both had served as consultants to the Defendants in the underlying

patent cases and that Solvay and Par/Paddock's counsel's communications with the

two consultants were protected by the work-product doctrine.  Defendants objected

to any further contact between these two experts and Plaintiffs.[3]  Roberti Decl. Exs.

B & C.  Solvay faxed a letter to Dr. Maibach informing him that he could not work

for the Plaintiffs in this case, and requesting that he have no further contact with

the Plaintiffs' lawyers in this case.  Roberti Decl. Exs. D, E.

In response, Plaintiffs' patent counsel, Russell Chorush from the

Heim Payne firm, sent a letter to Dr. Maibach admonishing him to "maintain the

confidentiality of my communications with you" — strongly suggesting that Mr.

Chorush in fact has had confidential, substantive communications with Solvay's

former consultant.  Roberti Decl. Exs. F, G.  As we understand, Mr. Chorush and

---

[3] Solvay asked Plaintiffs to suspend patent-merits-related depositions until this
motion is decided because it would be improper and highly prejudicial to have
witnesses deposed by lawyers exposed to Solvay's work product on those same
subjects.  Solvay has no objection to depositions on other subjects proceeding.

his firm have been specifically retained by the Plaintiffs as their patent law

specialists.  Solvay and its counsel have refrained from contacting Dr. Maibach

directly, to avoid any chance of impinging on Plaintiffs' own work product.

Roberti Decl. ¶¶ 4-5.

Plaintiffs have since disclosed that they first contacted Dr. Maibach in

late September 2010, that he has already billed them for 19.5 hours of work, that

he may have done additional work for Plaintiffs for which he has not yet submitted

a bill, and that lawyers from the Heim Payne and Garwin Gerstein firms — both

representing Plaintiff Louisiana Wholesale Drug in this matter — had spoken

directly with Dr. Maibach.  *Id.* ¶¶ 8-9.  According to Plaintiffs, Dr. Maibach told

them he had never consulted for any of the Defendants in the underlying case.

Roberti Decl. Ex. H, at 3.

### C.    **Solvay's Meet and Confer Efforts**

Solvay has made substantial efforts to resolve part or all of this

dispute without motion practice.  To demonstrate that Dr. Maibach had indeed

been privy to Solvay's patent counsel's mental impressions and other work

product, Solvay provided a copy of the retention agreement for Dr. Maibach in the

patent case.  Roberti Decl. ¶¶ 7, 10.  Solvay also described to Plaintiffs' counsel

the nature of Mr. Ferguson's communications with Dr. Maibach, including the fact

that he had shared case strategy and legal analyses with Dr. Maibach.  *Id.* ¶ 10.

Plaintiffs have stated that these disclosures, even if they were put in sworn declarations, are insufficient to satisfy Plaintiffs that Dr. Maibach had access to Solvay's work product.  Plaintiffs contend that further information is needed from Mr. Ferguson, but they have refused to tell us what further information they need.  Solvay has explained that it is prepared to consider providing further information from Mr. Ferguson if Plaintiffs will identify what they need.  *Id.* ¶¶ 10-11.

Thus far, Plaintiffs have refused to provide a copy of their retention agreement with Dr. Maibach.  They also have refused to describe the nature of the communications between Dr. Maibach and Heim Payne or Garwin Gerstein, although they have not denied that these firms had substantive discussions with Dr. Maibach.  Plaintiffs have also refused to disclose whether any information from Dr. Maibach was shared with other Plaintiffs' counsel.  They also have been unable or unwilling to identify which Plaintiffs retained Dr. Maibach.  *Id.* ¶ 11.

According to Plaintiffs, they will provide additional information regarding their retention of and consultation with Dr. Maibach only as part of a complex process of negotiating mutual declarations, undertaken with the goal of establishing that the experts need to be disqualified but that no Plaintiffs' counsel

needs to be disqualified.  Unless Defendants agree to negotiate the form of such

declarations, Plaintiffs refuse to disclose any further information or to discuss

whether they should forgo any effort to rely on Dr. Maibach.  *Id.* ¶¶ 12-13.

## III.   ARGUMENT

### A.    <u>Dr. Maibach Must Be Disqualified</u>

#### 1.    **Parties cannot retain experts exposed to their adversaries' relevant confidential or work-product information**

It is fundamental that a non-testifying expert exposed to the

confidential, privileged, or work-product information of a party cannot switch

sides so that same information could be used adverse to that party.  The legal

principles governing expert disqualification are simple: experts must be

disqualified if (1) it was "objectively reasonable for the first party who claims to

have retained the expert to conclude that a confidential relationship existed"

between it and the consultant, and (2) "confidential or privileged information"

relevant to the current litigation was in fact "disclosed by the first party to the

consultant."  *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1181 (5th

Cir. 1996); *accord Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 583 (D.N.J.

1994); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va.

1991).  The net effect is that, under the Federal Rules, "parties will rarely be able

to avail themselves . . . of the other side's expert witnesses."  *Indus. Risk Insurers*

*v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1444-45 (11th Cir. 1998).

The Fifth Circuit's analysis in *Koch Refining* is instructive.  There, the court affirmed the disqualification of an expert retained to testify against Continental Insurance, for whom he formerly worked in the same case as a non-testifying consultant three years earlier.  First, the court held that Continental "had a reasonable expectation of confidentiality" with the consultant it had retained, "and that such expectation continued after [the consultant] was 'discharged'" from his engagement.  *Koch Ref.*, 85 F.3d at 1182.  Second, the Fifth Circuit held that confidential information would naturally have been exchanged if the consultant's interaction with Continental's lawyer "include[d] 'discussion of [Continental's] strategies in the litigation'" and "'[Continental's] views of the strengths and weaknesses of each side'" as opposed to "purely technical information" that was not confidential.  *Id.* (quoting *Mayer v. Dell*, 139 F.R.D. 1, 4 (D.D.C. 1991)).  The court relied on the fact that Continental had paid the consultant $8000 for his services, that the consultant reported his opinions to Continental's counsel, and that Continental's "counsel 'spent considerable time with [the consultant] explaining his entire theory of the case as well as trial tactics.'" *Id.*

### 2.     Solvay had a confidential relationship with Dr. Maibach

Here, there can be no doubt that a confidential relationship existed

between Mr. Ferguson's firm and Dr. Maibach, a non-testifying consultant Mr.

Ferguson retained to help him analyze the merits of the case.  Dr. Maibach was

formally retained and paid.  *See* Ferguson Decl. ¶ 6 & Ex. A.  He signed a written

retention agreement expressly providing that information received from attorneys,

as well as conclusions and communications reflecting such information, would be

confidential.  Dr. Maibach was bound by his confidentiality obligations even after

his engagement was concluded.  *See* Ferguson Decl. Ex. A.  More importantly,

Solvay's lead patent counsel understood their relationship to be confidential and

expected Dr. Maibach to keep information shared with him confidential.  On that

understanding, Mr. Ferguson disclosed legal strategy and mental impressions to

Dr. Maibach based on the expectation of confidentiality.  Ferguson Decl. ¶¶ 5-7.

Notably, Dr. Maibach never submitted a Rule 26(a)(2) report in the

patent case, was never designated as a testifying expert, and never testified at

deposition or trial.  *Id.* ¶ 7.

### 3.   Solvay's lead patent counsel communicated relevant confidential information to Dr. Maibach

Nor can there be doubt that Mr. Ferguson disclosed confidential work

product to Dr. Maibach that is highly relevant to the subject matter of this case.  As

explained above and in his declaration, Mr. Ferguson spoke at length with Dr.

Maibach on multiple occasions over a several-month period regarding the

13

substance of the patent case, including the challenges to the validity of the patent
and the legal implications of the ingredients that make up AndroGel's unique
formulation.  Ferguson Decl. ¶ 9.

As in the *Koch* case, Mr. Ferguson's conversations with Dr. Maibach
"include[d] 'discussion of [Solvay's] strategies in the litigation,'" and of Solvay's
"'views of the strengths and weaknesses of each side.'"  *See id.* ¶¶ 7, 9.  Also as in
the *Koch* case, Mr. Ferguson incorporated Dr. Maibach's responses and analysis
into Solvay's litigation strategy.  *See id.* ¶¶ 8-9.

The confidential information that Solvay shared with Dr. Maibach is
also highly relevant to this case.  *Compare* Ferguson Decl. ¶ 8 (Dr. Maibach
assisted Solvay's counsel with "understanding . . . the role that each of the
ingredients in AndroGel's formulation played in achieving the unique
pharmacokinetic profile described in the '894 Patent"), *with* Pls.' Response to
Interrogatory No. 11 (contending that the patent litigation was a sham because
addition of "unlisted elements included in the Generic Defendants' formulation"
such as sodium hydroxide and water affect the "basic and novel properties" of the
invention claimed in the '894 patent).[4]  Not only is the merit of the underlying

---

[4] This interrogatory response was previously filed as Exhibit B-1 to the Declaration
of Elena K. Chan in support of Plaintiffs' motion for issuance of letters rogatory
under the Hague Convention.

cases the very question to be resolved here, *see FTC v. Watson Pharms., Inc.*, 611 F. Supp. 2d 1081, 1089 (C.D. Cal. 2009) (noting the "close ties between this antitrust case and the underlying patent cases"), but Solvay's subjective views of the merits of the patent case are directly at issue here.[5]  Plaintiffs' sham litigation claims require them to show that Solvay pursued the patent case *knowing* that its claims had no merit.  *See Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (litigation is a "sham" only if its merit is not "'sincerely and honestly'" believed by the party bringing it).  Thus, in this case, patent counsel's analysis of the merits of the '894 patent litigation is particularly relevant, and Plaintiffs' access to that work product is particularly prejudicial to Solvay.  There is perhaps no clearer example of a "substantial relationship" between litigations than that between the patent case and this antitrust case that challenges the merits of that same patent case.

There is no recourse here to protect Solvay's work product and confidential information other than disqualification of Dr. Maibach.

---

[5] Plaintiffs may argue that, unlike typical disqualification scenarios, the experts here were consultants to the Defendants in a "different case," *i.e.*, in the patent litigation underlying these proceedings.  But that distinction is without a difference, for (1) Plaintiffs' claims are based upon relitigating the underlying patent case; and (2) the rules do not turn on whether work product was shared in the same or a different case.  The question is whether Defendants' counsel shared work product relevant to these proceedings with these consultants.

**B.**     **All Counsel Who Could Have Been Exposed to Solvay's**
          **Confidential Information Should Be Disqualified**

It appears that at least four Plaintiffs' lawyers from two firms (the

Heim Payne and Garwin Gerstein firms) have received substantive information and

analysis from Dr. Maibach.  Whatever their intent in retaining Dr. Maibach (and

Dr. Michniak), Plaintiffs cannot unring this bell.  We have no way to know what

work-product information from Solvay's patent counsel Dr. Maibach shared with

these counsel, or which of Dr. Maibach's analyses reflect input from Solvay's

patent counsel.  Indeed, many strategic decisions made by Plaintiffs to date — such

as which of Solvay's litigation positions to characterize as "sham" in interrogatory

responses, deposition strategy on the patent merits, or which prior art to focus on

— may have been informed by analysis from Dr. Maibach potentially tainted by

Solvay's work product.  There is no way to know.  For this reason, courts have

adopted as a "rule of necessity" the presumption that counsel in these situations

have been tainted by their *potential* exposure to an adversary's work product.

**1.**     **Lawyers who gain access to an adversary's work product or**
          **privileged information must be disqualified**

Lawyers who receive advice from a side-switching expert gain an

improper advantage — the full extent of which is impossible to ascertain — and

therefore face disqualification, regardless of their intent.  "The central concern in

cases in which counsel has retained a side-switching expert is whether counsel has unfairly obtained confidential information about the opposing party." *N. Pacifica, LLC v. City of Pacifica*, 335 F. Supp. 2d 1045, 1051 (N.D. Cal. 2004). Such counsel are "at least potentially in a position to use privileged information concerning the other side through prior representation . . . thus giving his present client an unfair advantage." *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979). Although disqualification may seem harsh, it is the only appropriate remedy "where necessary to preserve the integrity of the adversary process." *Id.*

The retention of Dr. Maibach places Plaintiffs' counsel who have consulted with him in an untenable ethical position: intentionally or not, they may have obtained Solvay's privileged or work-product information. Rule 3.4(g) of the Georgia Rules of Professional Conduct prohibits "us[ing] methods of obtaining evidence that violate the legal rights of the opposing party or counsel." This includes (i) facts known or opinions held by a consulting expert, Fed. R. Civ. P. 26(b)(4)(D); (ii) attorney-client privileged information, Fed. R. Civ. 26(b)(1); and (iii) work product and litigation strategy, Fed. R. Civ. P. 26(b)(3). *See Indus. Risk Insurers*, 141 F.3d at 1444-45 (recognizing these three limitations on discovery).

Plaintiffs have suggested that Solvay must make an extraordinary showing to justify disqualification, but that platitude rings hollow. "[T]he

misconduct need not be egregious . . . .  Conduct that merely *suggests* that one side

might enjoy the disclosure of confidential information may warrant

disqualification." *Best Western Int'l, Inc. v. CSI Int'l Corp.*, 1995 WL 505565, at

*2 (S.D.N.Y. Aug. 25, 1995) (emphasis added).  As this Court has itself explained,

"[a]ny doubts as to the existence of a violation of the rules should be resolved in

favor of disqualification." *Jones v. InfoCure Corp.*, 2003 WL 22149656, at *2

(N.D. Ga. May 13, 2003) (Thrash, J.) (quoting *Graco Children's Prods., Inc. v.

Regalo Int'l, LLC*, 1999 WL 553478, at *2 (E.D. Pa. July 29, 1999)).

> **2.     Courts presume that lawyers gain access to an adversary's
> work product when they retain an adversary's former
> consultant who was himself exposed to such work product**

Once it has been established that a lawyer has retained an expert with

whom an adversary shared its own work product, courts have *presumed* that this

work product was transmitted to the lawyer, without requiring detailed proof.  *See,

e.g.*, *N. Pacifica*, 335 F. Supp. 2d at 1051; *Cordy*, 156 F.R.D. at 583.  Many courts

have held that this presumption is irrebuttable.  *See MMR/Wallace Power & Indus.,

Inc. v. Thames Assocs.*, 764 F. Supp. 712, 724 (D. Conn. 1991) (collecting cases).

The presumption is born of the necessity that it is impossible for the

Court or for Solvay here to determine precisely how much of its work product has

been transmitted to Plaintiffs' counsel through the experts.  To make such a

determination would require infringing on the very Solvay work product that this motion seeks to protect.  It would also require a detailed examination into Plaintiffs' counsel's communications with these experts.  Solvay, for example, has no way to demonstrate what information Dr. Maibach shared with Plaintiffs' counsel.  Even if discovery were available on this issue, Solvay's work product could, and likely would, influence Dr. Maibach's analyses even without his conscious awareness or memory of it.

For example, in *Cordy*, the plaintiff retained James Green, a forensic engineer, to consult regarding the case pursuant to a written retention agreement, and the plaintiff's attorney sent the consultant a binder of case-related documents. *Cordy*, 156 F.R.D. at 576.  The consultant billed for 27 hours of work, provided only an informal oral opinion to the plaintiff's lawyer, and resigned after two months. *Id.* at 577.  Six months later, the defendant's law firm retained Green, who executed a retention agreement with the defendant's counsel promising not to disclose any information he had learned from the plaintiff — and there was no evidence he ever broke that promise. *Id.* at 578-79.

The court did not hesitate to disqualify both Green and the defendant's law firm.  The court found that Green and the plaintiff's lawyer had established a confidential relationship through the retention agreement, and that the

lawyer shared confidential information in the form of the trial strategy, the theory of the case, the investigation, the targeted defendants, and the selection of documents for Green to review.  *See id.* at 581-84.  Then, the court *presumed* that Green shared this confidential information with the defendants' lawyers, rejecting testimony to the contrary as self-serving and implausible: "To believe Green did not and will not remember and ultimately use that information, even 'subliminally,' defies common sense and human nature."  *Id.* at 584 (citation omitted).  Disqualification was the only appropriate remedy given the plaintiff's "interest in a trial free from risk that confidential information will be used against him and the public's interest in the integrity of the judicial process."  *Id.*

In another leading case, *Shadow Traffic Network v. Superior Court*, 24 Cal. App. 4th 1067 (1994), counsel for the plaintiff, Metro, met with a team at Deloitte & Touche to discuss the possibility of retaining them as experts against the defendant, Shadow.[6]  At the meeting, "aspects of Metro's action against Shadow were discussed," but the meeting lasted only an hour, and Deloitte "did not receive an engagement letter, retainer, or any compensation."  *Id.* at 1071-72. Later, Shadow's lawyers at Latham & Watkins retained one of the Deloitte experts

---

[6] As with most issues concerning attorney disqualification, state-law decisions are highly persuasive, given that "[t]here is no substantial difference between federal and state law principles on this question."  *Cordy*, 156 F.R.D. at 579.

20

who had met with Metro's lawyers. *Id.* This resulted in disqualification of the

entire Latham & Watkins firm. The court first found that Metro's attorneys had

provided confidential work product to Deloitte, relying on declarations from

Metro's attorneys explaining that they "extensively discussed Metro's litigation

and trial strategies." *Id.* at 1082. That the meeting between Metro's lawyers and

Deloitte lasted only an hour was insignificant. *Id.* at 1085. The question was

whether confidential information was communicated, not how much. Although

Deloitte personnel submitted declarations stating they did not recall learning any

confidential information, the court found these declarations irrelevant. The

question was whether confidential information was communicated, not whether the

expert consciously remembered it. *Id.* at 1082-83.

The court then adopted a presumption that Deloitte shared that

confidential information with Latham & Watkins. The court explained that this

was "a rule by necessity because the party seeking disqualification will be at a loss

to prove what is known by the adversary's attorneys and legal staff." *Id.* at 1085.

Like the *Cordy* court, the *Shadow Traffic* court was not persuaded by declarations

from Latham and Deloitte stating that Deloitte had not disclosed any of Metro's

confidential information. Not only were the declarations self-serving, but even if

no explicit disclosure had occurred, Latham "could still obtain the benefit of the

21

information because the data, consciously *or unconsciously*, could shape or affect the analysis and advice [the Deloitte experts] rendered to Shadow."  *Id.* at 1086 (emphasis added).

### 3.     The Court should presume that Dr. Maibach used or disclosed Solvay's work product to Plaintiff's counsel

As explained above, Solvay entered into a confidential relationship with Dr. Maibach, and shared subjective legal analyses, mental impressions, and strategies with Dr. Maibach based expressly on the existence of that confidential relationship.  In accord with the cases discussed above, the Court should presume that Dr. Maibach has used or disclosed Solvay's work product to those Plaintiffs' counsel who have worked with him over the past five months.  Unless counsel can demonstrate that they had no substantive discussions with Dr. Maibach, the Court should find that Plaintiffs cannot rebut the presumption.  It is "highly unlikely" Dr. Maibach could "conscientiously discharge" his duties to Plaintiffs "and at the same discharge" his duties "not to divulge confidential information received" from Solvay.  *Shadow Traffic*, 24 Cal. App. 4th at 1086; *see also Cordy*, 156 F.R.D. at 582 ("It is simply not possible for [the expert] to ignore what he learned . . . .  At the very least, his [original] engagement . . . has to 'subliminally affect his testimony and assessment of facts.'"); *MMR/Wallace*, 764 F. Supp. at 727 (relying on a "'nagging suspicion'" that the attorney's "preparation and presentation has

22

already been unfairly benefitted").

According to Plaintiffs, the Heim Payne and Garwin Gerstein firms have worked with Dr. Maibach.  Roberti Decl. ¶ 9.  Plaintiffs have refused, however, to describe the communications those firms have had with Dr. Maibach, even when Solvay raised the possibility of disqualification and asked specifically for information that would establish that they did not have substantive discussions with Dr. Maibach.  *Id.* ¶ 11.  Instead, Mr. Chorush of Heim Payne admonished Dr. Maibach to "maintain the confidentiality of my communications with you."  Roberti Decl. Exs. F, G.  Pregnant in this directive is that Dr. Maibach had communications with Mr. Chorush that could be regarded as confidential.  These two firms should be disqualified.[7]

Plaintiffs will not be unduly prejudiced by the disqualification of the Heim Payne and Garwin Gerstein firms.  Direct Purchaser Plaintiffs collectively

---

[7] Counsel may submit affidavits seeking to establish that none of Solvay's confidential information was transmitted to them.  But Plaintiffs' counsel have no basis for knowing what work-product information Dr. Maibach discussed with Solvay's patent lawyers, so they cannot determine whether they gained access to work product or not.  Nor does Dr. Maibach, "as a lay person," have the ability to judge the extent to which work product was shared with him by Mr. Ferguson: he "does not know what information or communications were protected by the attorney-client privilege" and accordingly is not "in a position to differentiate between disclosable and non-disclosable information without the assistance of counsel." *MMR/Wallace*, 764 F. Supp. at 726.  And the only way to test those affidavits would be depositions of counsel.

are represented by more than fifteen law firms.  Louisiana Wholesale is itself

represented by *four* separate firms.  To the extent that Plaintiffs require the

assistance of specialized patent counsel, there are many other firms who could

provide such services.

### C.   The Court Should Order Other Plaintiffs' Counsel to Provide Information Sufficient to Establish Whether They Are Tainted

Plaintiffs have refused to disclose which other firms may have

obtained the benefit of information or analysis from Dr. Maibach or have worked

with Heim Payne or Garwin Gerstein and thus benefited indirectly from whatever

those firms have learned from Dr. Maibach.  Solvay respectfully requests that the

Court order Plaintiffs' counsel to produce information to Solvay and to the Court

that will enable the Court to determine which other Plaintiffs' counsel, if any, are

likely to have been directly or indirectly tainted by exposure to Solvay's privileged

and confidential information.  For example, Plaintiffs should disclose which firms

have obtained patent analyses informed by information or analysis from Dr.

Maibach, and which firms have been working on developing Plaintiffs' patent

strategy.  Such disclosures might suggest that other firms have also been

potentially exposed to Solvay's work product information.

## IV. CONCLUSION

For the reasons set forth above, Solvay respectfully requests the following relief:

- An order disqualifying Dr. Maibach from serving as an expert for Plaintiffs in this litigation;

- An order disqualifying Heim, Payne & Chorush, L.L.P. and Garwin Gerstein & Fisher, LLP from further participating in this litigation; and

- An order requiring Plaintiffs' counsel to provide information sufficient to permit the Court to identify which other law firms, if any, have been tainted by acquiring Solvay's privileged and confidential information through direct or indirect contact with Dr. Maibach.

Respectfully submitted this 22nd day of March 2011.

/s/ Rohit K. Singla

Teresa T. Bonder**                    Jeffrey I. Weinberger*
Georgia Bar No. 703969                Rohit K. Singla*
Matthew D. Kent**                     Elisabeth J. Neubauer*
Georgia Bar No. 526272                Munger, Tolles & Olson LLP

Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
(404) 881-7000 (telephone)
(404) 881-7777 (facsimile)
teresa.bonder@alston.com
matthew.kent@alston.com

**\*\*Counsel for Unimed
Pharmaceuticals, LLC and Abbott
Products, Inc. f/k/a Solvay
Pharmaceuticals, Inc. in all actions
except Walgreen Co. v. Unimed
Pharmaceuticals, LLC, 1:09-cv-3019**

355 South Grand Avenue
35th Floor
Los Angeles, CA 90071
(213) 683-9100 (telephone)
(213) 683-5100 (facsimile)
jeffrey.weinberger@mto.com
rohit.singla@mto.com
elisabeth.neubauer@mto.com

John Roberti*
Mark W. Ryan*
Rebecca Valentine*
Mayer Brown LLP
1909 K Street NW
Washington, D.C. 20006
202-263-3000 (telephone)
202-263-3300 (facsimile)
jroberti@mayerbrown.com
mryan@mayerbrown.com
cjkelly@mayerbrown.com
rvalentine@mayerbrown.com

* Practicing pursuant to this Court's
Initial Case Management Order

*Counsel for Unimed Pharmaceuticals, LLC and Abbott Products, Inc. f/k/a Solvay
Pharmaceuticals, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **IN RE ANDROGEL ANTITRUST LITIGATION (II)** | **CASE NO. 1:09-MD-2084-TWT**<br><br>**DIRECT PURCHASER CLASS ACTIONS**<br><br>**DIRECT PURCHASER INDIVIDUAL ACTIONS** |
| **ROCHESTER DRUG CO-OPERATIVE, INC., ET AL.,**<br>          Plaintiffs,<br>                    v.<br>**UNIMED PHARMACEUTICALS,  INC., ET AL.**<br>          Defendants. | **CASE NO. 1:09-CV-956-TWT** |
| **LOUISIANA WHOLESALE DRUG CO., INC., ET AL.,**<br>          Plaintiff,<br>                    v.<br>**UNIMED PHARMACEUTICALS,  INC., ET AL.,**<br>          Defendants. | **CASE NO. 1:09-CV-957-TWT** |
| **MEIJER, INC., ET AL.,**<br>          Plaintiffs,<br>                    v.<br>**UNIMED PHARMACEUTICALS, INC., ET AL.**<br>          Defendants. | **CASE NO. 1:09-CV-958-TWT** |

| | |
|---|---|
| **STEPHEN L. LAFRANCE PHARMACY, INC. ET AL.** <br><br>         **Plaintiffs,** <br><br>         **v.** <br><br> **UNIMED PHARMACEUTICALS, INC., ET AL.** <br><br>         **Defendants.** | **CASE NO. 1:09-CV-2913-TWT** |
| **RITE AID CORPORATION, ET AL.,** <br><br>         **Plaintiffs,** <br><br>         **v.** <br><br> **UNIMED PHARMACEUTICALS, INC., ET AL.** <br><br>         **Defendants.** | **CASE NO. 1:09-CV-2776-TWT** |
| **WALGREEN CO., ET AL.,** <br><br>         **Plaintiffs,** <br><br>         **v.** <br><br> **UNIMED PHARMACEUTICALS,  LLC, ET AL.** <br><br>         **Defendants.** | **CASE NO. 1:09-CV-3019-TWT** |
| **SUPERVALU, INC.,** <br><br>         **Plaintiff,** <br><br>         **v.** <br><br> **UNIMED PHARMACEUTICALS, LLC, ET AL.** <br><br>         **Defendants.** | **CASE NO. 1:10-CV-1024-TWT** |

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel hereby certifies that the foregoing

motion and memorandum of law has been prepared in accordance with Local Rule

5.1 using Times New Roman 14 point font.

Respectfully submitted this 22nd day of March 2011,

/s/ Rohit K. Singla
Rohit K. Singla*
MUNGER, TOLLES & OLSON LLP
355 S. Grand Avenue, 35th Floor
Los Angeles, CA 90071
(213) 683-9100 (Telephone)
(213) 687-3702 (Facsimile)
Rohit.Singla@mto.com

*Counsel for Unimed Pharmaceuticals,
LLC and Abbott Products, Inc. f/k/a
Solvay Pharmaceuticals, Inc*

* Practicing pursuant to this Court's
Initial Case Management Order